THE STATE OF OHIO, APPELLEE, *v.* BEDFORD, APPELLANT.

[Cite as State *v.* Bedford (1988), 39 Ohio St. 3d 122.]

(No. 86-1976—Submitted June 9, 1988—Decided October 12, 1988.)

124

*Arthur M. Ney, Jr.,* prosecuting attorney, *Leonard Kirschner, Christian J. Schaefer, Thomas P. Longano* and *Patrick Dinkelacker,* for appellee.

*H. Fred Hoefle* and *Peter Rosenwald,* for appellant.

MOYER, C.J. Daniel Bedford appeals his aggravated murder conviction and death sentence. In reviewing a death penalty case, this court must review the proceedings in the appellate and trial courts. Second, we must independently review the death sentence to determine whether the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Finally, we must consider whether appellant's sentence is proportionate to the penalty in other cases. For the reasons stated below, we affirm appellant's conviction and sentence of death.

I

Bedford's first proposition of law challenges the prosecutor's closing argument and the trial court's jury instructions. He argues that both impermissibly informed the jury that they did not have the final responsibility for determining whether he should receive the death penalty. While acknowledging that the challenged comments were consistent with this court's prior holdings, Bedford nonetheless urges us to reverse those decisions as being in conflict with the holding of *Caldwell* v. *Mississippi* (1985), 472 U.S. 320.

A review of the record confirms that both the prosecutor's closing argument and the trial court's jury instructions were within the permissible boundaries established by our prior holdings. The comments neither reduced the jury's sense of responsibility nor increased the possibility of a recommendation of death in reliance upon the appellate process. *State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 6, 514 N.E. 2d 407, 413; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 113-114, 31 OBR 273, 275, 509 N.E. 2d 383, 387-388; see, also, *State* v. *Beuke* (1988), 38 Ohio St. 3d 29, 526 N.E. 2d 274, and cases cited therein.

Bedford's first proposition of law is overruled.

II

In his second proposition of law, Bedford identifies four remarks made by the prosecutor during the closing arguments at the sentencing phase of trial and contends these comments require that his death sentence be vacated. We do not agree with this contention.

At the sentencing phase of appellant's trial, the prosecutor read a passage from the decision in *Gregg* v. *Georgia* (1976), 428 U.S. 153, 183, to the effect that capital punishment is an expression of society's moral outrage at particularly offensive conduct. This court has previously disapproved of such a closing argument and we reiterate our caution to prosecutors to avoid such argument. However, such an argument is not grounds for reversal. *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 82-83, 512 N.E. 2d 611, 615-616. Additionally, during this portion of closing argument, the prosecutor also reminded the jury, no less than four times, to carefully weigh the evidence and identified the appropriate standard of review no less than three times. Thus, the prosecutor's com-

ment, in context, does not merit reversing the death sentence.

The second portion of the state's closing argument, made after appellant's closing argument, presents a closer question. During this argument, the assistant prosecutor stated that there was no guarantee that Bedford would serve either a twenty- or thirty-year sentence without parole because the statute could be changed, mentioned that the prosecution was not permitted to cross-examine Bedford after he made his unsworn statement, and also showed pictures of the two victims originally introduced at the guilt phase of trial.

Undeniably, the conduct of the prosecutor was ill-advised. The issue, however, is whether the conduct requires that the death sentence be vacated. We conclude that it does not.

The prosecutor argued that a life sentence was not guaranteed because the General Assembly could amend the statute and the term of imprisonment. This comment, that the court could not guarantee that Bedford would serve a twenty- or thirty-year sentence, after an objection, was followed with the prosecutor's observation that the jury could not base its decision on that fact because it would violate its oath.

We expressly disapprove of arguing to a jury that a statutory penalty could be amended. However, reviewing the closing argument as a whole along with the prosecutor's observation and the correct jury instructions, we determine the comment is not grounds for reversing Bedford's sentence. The comment that appellant's testimony was not under oath must also be read in context. The brief reference was directed at the credibility of the testimony. Such argument has been held to be proper. *State* v. *Mapes* (1985), 19 Ohio St. 3d 108, 116, 19 OBR 318, 324-325, 484 N.E. 2d 140, 147; *State* v. *Jenkins* (1984), 15 Ohio

St. 3d 164, 217, 15 OBR 311, 356-357, 473 N.E. 2d 264, 309-310.

Finally, it is not *per se* error to reintroduce to the jury photographs originally shown at the guilt phase. Our decision in *State* v. *Thompson, supra,* does not require such a result and differs from this case in three distinct respects.

First, in *Thompson,* the prosecutor continued with inappropriate closing argument despite the sustaining of several objections by the trial court. Second, the prosecutor referred to Thompson's failure to testify during the guilt phase of the trial and thereby violated Thompson's constitutional rights. Finally, the prosecutor in *Thompson,* during the sentencing phase, reminded the jury about the photographic slides originally introduced at the guilt phase. This court concluded that it was harmless error to introduce the gruesome and repetitive photographic slides at the guilt phase because of the overwhelming evidence of guilt. However, the reference to the objectionable slides *combined with* the prosecutor's objectionable closing arguments impaired Thompson's right to a fair mitigation hearing. In this case, the photographs in question did not taint the guilt phase of the trial.

Based on the foregoing, Bedford's second proposition of law is overruled.

### III

In his third proposition of law, Bedford asserts that the jury was coerced into recommending the death penalty.

During its deliberations at the penalty phase, the jury sent the following inquiry to the trial judge: "* * * 'If we cannot reach a unanimous decision for this part of the trial, what would happen? Is there an approximate time frame of deliberation before which we can declare that we are unable to reach a verdict?' " The judge responded:

"* * * Ladies and gentlemen of the jury, the Court is advised that you have indicated difficulty in making a recommendation of sentence. Now the Court suggests to you that since the trial of this case means a great deal to the parties and to the public and has been expensive in time, effort and money, the Court urges you to make every reasonable effort to agree on a recommendation.

"In an ordinary case where the jury is deadlocked, the Judge can declare a mistrial and another jury can be selected to rehear the case. In this matter, such a solution is, obviously, undesirable since this jury has already decided guilt and no new jury could balance as easily the aggravating circumstance and mitigating factors. You then must consider that you are the jury that is in the best position to make an intelligent and fair recommendation in this matter, and the Court urges you to make every reasonable conscience [*sic*] effort to do so.

"There's no time limit set by law to the time a jury may take to make a recommendation. The Court, in an effort to help you in your deliberations, suggests the following: Return to the jury room and consider whether you are, in fact, unable with reasonable anticipation to come to an agreement. If you believe an agreement may be reached, continue to deliberate. If then you reach a unanimous decision to recommend the death penalty or life sentence, do so under the instructions previously given.

"If, after exhausting all reasonable discussion, you remain hopelessly deadlocked on the issue of the death penalty, then you will consider that the prosecution has failed to prove to you as a unanimous group that the aggravating circumstance outweighs beyond a reasonable doubt the mitigating factors. If you in fact reach the last conclusion, proceed to recommend the appropriate life sentence."

In addition, Bedford notes that one juror required medical attention for stress during the jury's deliberations.

The thrust of Bedford's argument is that the instruction given to the jury was overly coercive and encouraged the jury to make a death recommendation. However, the trial court was not advised that the jury was, in fact, deadlocked. His advice to the jury was a reasonable response to the jury's question and complied with this court's decision in *State* v. *Maupin* (1975), 42 Ohio St. 2d 473, 71 O.O. 2d 485, 330 N.E. 2d 708, where we indicated that a trial court should urge a jury to reach a decision only if it could conscientiously do so. Here, the jury was instructed to further deliberate and determine whether it could reach a fair and intelligent recommendation after making every reasonable, conscious effort to do so. This instruction did not unduly coerce a verdict. The cases cited by appellant are inapplicable because they are concerned with a trial court's instructions to a deadlocked jury.

The mere fact that a juror suffered a stress-related temporary illness does not bolster Bedford's proposition. It is not surprising that occasionally a juror will become somewhat stressed while making a life or death determination. After being polled, the juror stated that she concurred in the death verdict. There is no reversible error and this proposition of law is overruled.

## IV

Bedford maintains, in the fourth proposition of law, that his right to a fair trial was compromised when, in closing argument at the guilt phase, the prosecutor referred to him as a "demon." He also challenges the prosecutor's urging of the jury to do justice

to the victims in referring to appellant's defense as a smoke screen.

Parties are granted latitude in closing argument. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 269, 15 OBR 379, 404-405, 473 N.E. 2d 768, 794-795. If it is clear beyond a reasonable doubt that, absent the prosecutor's comment, the jury would have found Bedford guilty, then his conviction need not be reversed. *State* v. *Smith* (1984), 14 Ohio St. 3d 13, 14 OBR 317, 470 N.E. 2d 883.

While we do not condone such argument, a review of the entire proceedings establishes that appellant was not prejudiced by these remarks. Accordingly, the fourth proposition of law is without merit.

### V

In his fifth proposition of law, Bedford objects to the trial court's refusal to allow expert testimony regarding the "treatability" of his personality disorder (borderline personality) as compared to other capital defendants. He contends that such evidence was important for the jury to consider.

R.C. 2929.04(B)(7) states that any factors relevant to the issue of whether a defendant should be sentenced to death must be weighed by the jury. A defendant has broad latitude in the presentation of evidence. R.C. 2929.04(C).

All *relevant* evidence must be considered in mitigation. *State* v. *Jenkins, supra,* at 189, 15 OBR at 332, 473 N.E. 2d at 289. Comparing Bedford's treatability with that of other capital defendants is in the nature of the proportionality review which is the function of an appellate court rather than of a jury. R.C. 2929.05(A). Further, it would be impossible for the jury to adequately weigh the testimony without knowing the facts of each capital case.

The trial court permitted the expert witness' testimony that, in comparison with other "folks I've seen in courts," Bedford was one of the most treatable.

Here, appellant was not prevented from presenting relevant mitigation evidence and his proposition of law is without merit.

### VI

As the sixth proposition of law, appellant argues that the court of appeals failed to apply the correct burden of proof in weighing the aggravating circumstance against the mitigating factors. However, a review of the entire decision indicates that the court of appeals applied the correct standard of review. Therefore, this proposition of law is overruled.

### VII

In propositions of law seven, eight, and nine, Bedford urges that two prospective jurors were improperly removed for cause, thereby denying him a fair trial.

The proper standard for determining when a prospective juror may be excluded for cause is whether that juror's views would prevent or substantially impair the performance of duties in accordance with both the oath and instructions given a juror. *State* v. *Steffen, supra,* at 120-121, 31 OBR at 281, 509 N.E. 2d at 393; *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 17 OBR 414, 478 N.E. 2d 984.

Juror Tucker clearly indicated that, although she could "follow the law," she could not consider the death penalty.[3] Thus, she was properly excluded for cause.

___

[3] "Q. [By the court] Let me ask you this: Is this an opposition based upon religious belief, philosophy or what?

Juror Herweh presents a closer question. However, Herweh did indicate that he could not sign a statement putting anyone to death.[4]

Here, the trial court carefully questioned the juror to determine whether he could properly fulfill his oath and obligation as a juror. There will be situations where the trial court, after observing the demeanor and behavior of the juror, concludes that the juror cannot fulfill the duties incumbent with the oath and instructions given by the trial court. Some deference must be given to the trial court in those circumstances. *Wainwright* v. *Witt* (1985), 469 U.S. 412.

After careful consideration of the record, we conclude that the trial court did not err in dismissing the prospective jurors for cause. Therefore, propositions of law seven, eight, and nine are overruled.

## VIII

In his tenth, eleventh, and twelfth

---

"* * *

"A. [Juror Tucker] * * * I don't think I could be a part of convicting someone to the death sentence.

"Q. * * *

"Now, let me ask you first of all does it make any difference that you'll only be recommending the penalty? * * * Would you make such a recommendation?

"A. I don't believe so.

"Q. * * *Can you follow * * * [the] law?

"A. No.

"* * *

"A. * * *I would follow all instructions.

"Q. [By Mr. Longano] Including recommending death if that's warranted?

"A. Excluding recommending death.

"* * *

"A. I feel that they should not have that ability to take the life of another person.

"* * *

"A. I will follow all the laws until such time that I would be asked to say something about the death penalty.

"* * *

"JUROR TUCKER: No, I cannot. The way the two of you is [*sic*] saying it is different. He's saying could I follow the law. I could follow the law all the way up, and I think — I know if I make the recommendation for death, then that means he may get it, and no, I can't.

"* * *

"THE COURT: * * * Can you or can you not make that recommendation?

"JUROR TUCKER: Not for the death penalty, no."

[4] "Q. [The Court] Assuming that you have found that the aggravating factors outweigh the mitigating factors, will you sign the recommendation of the death penalty?

"A. [Juror Herweh] I have my doubts that I would because I don't feel that I would really have the knowledge being a novice, that I could condemn somebody —

"Q. * * * Will you or won't you sign that recommendation if you reach that point, or are you unable definitely to tell us whether you would or wouldn't?

"A. I definitely don't think that I would be able to sign such a waiver.

"* * *

"Q. [Mr. Breyer] Now, sir, you indicated, I believe in response to the Judge's question, that you would have difficulty recommending a verdict of — signing your name to a verdict form which recommended that the Judge impose the death penalty.

"A. This is true.

"* * *

"THE COURT: Well, now can you tell us that you will sign a recommendation of the death penalty if the law — if the aggravating circumstances outweigh the mitigating factors? Can you tell us you will or won't, or you don't know?

"JUROR HERWEH: I don't think I would. I don't believe I would sign the statement putting anyone to death."

propositions of law, Bedford challenges the voir dire process and asserts that he was denied an impartial jury.

The trial court did not permit defense counsel to inquire of prospective jurors whether they would find as mitigating factors Bedford's alcohol abuse and his father's murder. The trial court reasoned that the question sought a commitment of prospective jurors prior to the introduction of any evidence. It applied the same rule to similar questions posed by the prosecutor.

The scope of voir dire is within the trial court's discretion and varies depending on the circumstances of each case. *State* v. *Anderson* (1972), 30 Ohio St. 2d 66, 73, 59 O.O. 2d 85, 89, 282 N.E. 2d 568, 572. Any limits placed thereon must be reasonable. *State* v. *Bridgeman* (1977), 51 Ohio App. 2d 105, 109-110, 5 O.O. 3d 275, 277, 366 N.E. 2d 1378, 1383. The trial court did permit defense counsel to ask questions regarding the statutorily defined mitigating factors including whether they would consider relevant evidence pursuant to R.C. 2929.04 (B)(7). Indeed, at times the trial court, after sustaining objections, advised defense counsel to rephrase the questions and such advice was refused.

Reviewing the voir dire as a whole, the trial court did not abuse its discretion by limiting certain areas of inquiry and Bedford was not denied a fair and impartial jury. These propositions of law are therefore without merit.

### IX

In his thirteenth proposition of law, Bedford maintains that his initial arrest in Tennessee was improper and therefore his statements to police after the arrest were improperly admitted. He claims that the arresting officers lacked probable cause.

The record indicates that Bedford, after fleeing to Tennessee, told a friend there that he had killed two people in Cincinnati. The friend caused the local sheriff's department to be contacted. Upon arrival, a sheriff's deputy asked Bedford if he could help him in any way. Bedford dropped his head and the officer then asked, "Can I help you?" Bedford told the officers that he had killed two people. He was searched, given *Miranda* rights, and taken to jail. After his rights were again explained to him, Bedford gave police the statement.

Bedford's claim that he was arrested without probable cause is clearly meritless.

Contrary to his claims, Bedford's detention and subsequent arrest were based on reasonably objective grounds. *United States* v. *Mendenhall* (1980), 446 U.S. 544. The police had more than mere suspicion, *Florida* v. *Royer* (1983), 460 U.S. 491; in fact, they had been told by Bedford that he had killed two people. Accordingly, the incriminating statements made after the arrest based on probable cause were lawfully obtained. *Brown* v. *Illinois* (1975), 422 U.S. 590.

### X

In his fourteenth proposition of law, Bedford claims that one of the jurors repeatedly violated the trial court's instructions by listening to extrajudicial information about the case.

One of the jurors indicated that he had heard a radio report about the start of the trial and later in that same morning the broadcast again mentioned the trial. He stated that he had "blocked it out," that he could ignore the reports, and that he could decide the case on the facts presented at trial.

The record reveals that the juror learned only information that he already knew. The juror knew the name of the defendant, that a double

murder was involved, and that the trial was to begin that morning. Bedford does not establish any prejudice or harm resulting from the juror's having inadvertently heard two references to the trial. Therefore, he has failed to supply a threshold showing of bias or prejudice. *State* v. *Jenkins, supra,* at 237, 15 OBR at 374, 473 N.E. 2d at 325.

Appellant's fourteenth proposition of law is overruled.

## XI

In his fifteenth, sixteenth, and seventeenth propositions of law, Bedford challenges certain evidentiary rulings by the trial court.

First, he challenges the testimony regarding possible fingerprints taken from a shotgun found at the scene. In response to a Crim. R. 16 discovery motion, the appellant was informed that no fingerprint evidence was discovered. However, the state introduced evidence regarding partial, though unidentifiable, fingerprints.

During a bench conference at trial, the prosecution indicated the defense counsel knew of the evidence. The state originally did not intend to use the evidence until defense counsel impugned the investigative procedures. Thereafter, the state used the evidence to show how the investigation was conducted. Defense counsel refused the offer of·a continuance.

Bedford now speculates that, had he known of the evidence, defense experts might have examined it. However, as noted above, there was information that defense counsel did·know about the evidence. Further, Bedford can show no prejudice because the expert testified that none of the parties' prints could be identified.

Second, Bedford challenges the use of the statement taken at the sheriff's office in Tennessee. The testifying·officer used this statement to refresh his recollection of what Bedford had told him after he was arrested. Bedford claims that this was a "charade" designed to allow his statement to be read into the record.

The officer was permitted to use his notes, in this case the statement, to refresh his memory. Evid. R. 612. Defense counsel cross-examined the officer extensively regarding his notes. The trial court did not abuse its discretion in allowing the witness to use the statement to refresh his recollection.

Finally, Bedford challenges the admission of photographs he claims are repetitive and prejudicial.

The test for admitting gruesome photographic evidence is twofold. First, the probative value of the photographs must outweigh their prejudicial impact. Second, the photographs cannot be repetitive or cumulative. *State* v. *Thompson, supra,* at 9, 514 N.E. 2d at 416; *State* v. *Morales* (1987), 32 Ohio St. 3d 252, 257-258, 513 N.E. 2d 267, 273-274; *State* v. *Maurer, supra,* at paragraph seven of the syllabus.

Few of the photographs in this record are particularly gruesome or repetitive. There were two photographs of the same side of Toepfert's face and two photographs of the same angle portraying Toepfert's abdominal wound. We have concluded in prior cases that photographs more numerous than those in this case were not repetitive or cumulative. Further, the two photographs of the abdominal wound, inflicted after the victim's death, go to establishing the killer's state of mind.

Therefore, the admission of the photographs was not error. Bedford's fifteenth, sixteenth, and seventeenth propositions of law are overruled.

## XII

In his eighteenth proposition of law, Bedford urges that the trial

court's instruction on voluntary manslaughter improperly deleted a definition based on extreme emotional distress.

First, we note that the jury was given the proper instruction regarding the elements of voluntary manslaughter. The only issue is whether, in addition to the terms "sudden passion" and "sudden fit of rage" explicitly contained in R.C. 2903.03(A), the trial court should have included extreme emotional distress. However, extreme emotional distress is no longer a component of the definition of voluntary manslaughter. The trial court correctly cited the elements defined in R.C. 2903.03(A).

Further, the jury was not foreclosed from finding that Bedford acted with a *mens rea* that was less than purposeful. If the jury had concluded that he acted under the influence of a sudden passion, it could have found him guilty of voluntary manslaughter. *State* v. *Solomon* (1981), 66 Ohio St. 2d 214, 219, 20 O.O. 3d 213, 216, 421 N.E. 2d 139, 142.

Therefore, appellant's eighteenth proposition of law is overruled.

## XIII

In his nineteenth proposition of law, appellant contends that it was error to instruct the jury that he had to prove the defense of intoxication by a preponderance of the evidence.

Bedford's contention is not well-taken. Such an instruction does not remove the state's burden of proving its case against the defendant beyond a reasonable doubt. Even if the jury concluded that Bedford failed to establish the defense of intoxication, it was permitted to consider whether his claim of intoxication created a reasonable doubt as to his guilt. *Martin* v. *Ohio* (1987), 480 U.S. 228.

Here, the state was required to prove its case beyond a reasonable doubt. The burden of proof never improperly shifted to appellant. This proposition of law is overruled.

## XIV

Bedford's twentieth proposition of law places in issue the weight and sufficiency of the aggravating circumstance as compared to the mitigating factors. As discussed *infra,* we conclude that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. Accordingly, this proposition of law is overruled.

## XV

In his twenty-first proposition of law, Bedford challenges the method of conducting the proportionality review. He argues that a proportionality review must include those defendants eligible for capital punishment but not so indicted. Likewise, in his twenty-second proposition of law, he contends that a proportionality review must include all defendants either eligible for the death penalty and not so indicted and those prosecuted but not sentenced to death.

This court has repeatedly held that, because a proportionality review is not mandated in a constitutionally valid sentencing scheme, Ohio is free to define the proportionality review. This court has also previously rejected the arguments advanced by appellant. *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 4, 520 N.E. 2d 568, 571, and cases cited therein.

Accordingly, these propositions of law are overruled.

## XVI

In his twenty-third proposition of law, Bedford maintains that Ohio's capital sentencing scheme is unconstitutional because it violates the Equal Protection Clause. He acknowledges

that the holding of *McCleskey* v. *Kemp* (1987), 481 U.S. \_\_\_, 95 L. Ed. 2d 262, 107 S. Ct. 1756, precludes a federal constitutional challenge. Bedford nonetheless urges this court to find a violation of equal protection under the Fourteenth Amendment.

This proposition of law is overruled on the authority of the syllabus set forth in *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 512 N.E. 2d 585.

## XVII

In his twenty-fourth and final proposition of law, Bedford raises several constitutional issues to preserve them for further appeal. We answer each challenge briefly.

The state has a rational interest in imposing the death penalty and the statutory scheme is constitutional. *State* v. *Jenkins, supra; State* v. *Beuke, supra,* at 38-39, 526 N.E. 2d at 285.

We also reject Bedford's argument that the statutory scheme is unconstitutional because the death penalty is disproportionately inflicted by racial classification, based on our discussion above.

Bedford's argument that the statute is unconstitutional because it provides harsher treatment for felony-murder than for some premeditated murders is rejected on the authority of *State* v. *Jenkins* and *State* v. *Maurer, supra.*

Bedford contends that the statutory scheme is unconstitutional because a jury must recommend death where the aggravating circumstance outweighs the mitigating factors ever so slightly. First, appellant misstates the applicable standard of proof. Second, we have previously noted our confidence in Ohio juries to fairly and seriously weigh the evidence during the sentencing phase. *State* v. *Coleman* (1988), 37 Ohio St. 3d 286, 294, 525 N.E. 2d 792, 800.

Bedford's claim that a jury is precluded from considerations of mercy is overruled on the authority of *State* v. *Beuke, supra,* at 38-39, 526 N.E. 2d at 285; *State* v. *Jenkins, supra.*

Crim. R. 11(C)(3) does not needlessly encourage guilty pleas or waiver of any fundamental rights. *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 138, 22 OBR 203, 215, 489 N.E. 2d 795, 808.

Finally, the statutory scheme does not encourage the arbitrary or capricious infliction of the death penalty. *State* v. *Jenkins; State* v. *Maurer; State* v. *Coleman, supra.*

## XVIII

Having disposed of all the propositions of law set forth above, we must weigh the aggravating circumstance against the mitigating factors and determine whether the death penalty was properly imposed.

The jury convicted Bedford on one count of aggravated murder (R.C. 2903.01[A]), that he purposely and with prior calculation and design caused the death of Gwen Toepfert, and one count of murder (R.C. 2903.02[A]), that he purposely caused the death of John Smith.

The jury also found Bedford guilty on the specification to Count One, that he committed aggravated murder as part of a course of conduct that resulted in the purposeful killing of Gwen Toepfert and John Smith (R.C. 2929.04[A][5]). This constitutes the single aggravating circumstance.

We now focus attention on the mitigating factors. A review of the nature and circumstances reveals that Bedford's claim of intoxication is cast in serious doubt by the evidence. He searched for Smith after killing Toepfert. He shot both victims several times. Indeed, after Toepfert was

dead, he fired a shot into her pelvic region. He thereafter fled to Tennessee, where he appeared coherent and sober to several witnesses. Therefore, we assign little weight to his claim of intoxication.

Likewise, we give consideration to his claim of emotional stress. The expert testimony indicated that while Bedford was very stressed at the time of examination, he was able to make judgments and distinguish right from wrong. Though he was both alcohol dependent and generally dependent on others for reinforcement, his state of depression at the time of the killing could not be characterized as a mental illness. Finally, Bedford told the examining expert that once he entered the apartment building, he waited to enter the apartment, pondering what to do next. The expert did state that Bedford's depression, if he was incarcerated, was treatable.

With regard to appellant's history, character, and background, the record establishes that Bedford experienced several unfortunate, perhaps tragic, incidents during his lifetime. However, such experiences do not mitigate the crimes he committed.

We find no persuasive evidence that Bedford's victims induced or facilitated his crimes. It cannot be said that Toepfert's rejection of appellant's affections induced or facilitated the killings.

The next factor to consider is whether the offenses would have been committed but for the fact that Bedford was under duress, coercion, or strong provocation. While there is evidence that Bedford was under stress because of the relationship between Toepfert and himself, it cannot be classified as coercion or strong provocation. Likewise, duress generally indicates that some compulsion by threat exists, which is not the case

here. Nonetheless, we shall consider as a mitigating factor the claimed stress experienced by Bedford.

Next, we consider whether Bedford, at the time of committing the offenses, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law due to mental disease or defect. As the expert testimony previously discussed indicates, Bedford could distinguish right from wrong and did not have a mental disease. We give this factor little weight.

Concerning Bedford's youth, he was thirty-six at the time of the killings and we give this factor no weight.

The next factor to consider is the lack of a criminal conviction history. Bedford lacks a significant criminal background and this factor must be given weight.

Finally, in looking at any other relevant factors, we consider Bedford's claim of remorse, his poor communication skills, and the fact that he is a father of six children.

Balancing the mitigating factors enumerated above against the aggravating circumstance, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

Bedford was able to distinguish right from wrong, yet engaged in a specific and deliberate course of conduct which resulted in two brutal slayings. While waiting outside the site of the killings, he pondered his actions. After wounding Toepfert and killing Smith, he deliberately sought out Toepfert and killed her. He then sought Smith and returned to shoot his ex-girlfriend in the abdomen. Bedford's stress, personal problems, and difficult life do not mitigate the circumstances of such a course of conduct.

Having so held, it only remains for us to determine whether Bedford's death sentence is disproportionate or excessive. We conclude it is not.

Recently, this court upheld the death penalty under somewhat similar circumstances. See *State* v. *Poindexter, supra.* We have also upheld other death sentences when the defendant committed aggravated murder as part of a course of conduct. See *State* v. *Brooks* (1986), 25 Ohio St. 3d 144, 24 OBR 190, 495 N.E. 2d 407; *State* v. *Spisak* (1988), 36 Ohio St. 3d 80, 521 N.E. 2d 800.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

LOCHER, HOLMES and DOUGLAS, JJ., concur.

SWEENEY, WRIGHT and H. BROWN, JJ., dissent.

WRIGHT, J., dissenting. At the risk of violating the Biblical proverb that "* * * he that repeateth a matter separateth very friends,"[5] I must respectfully dissent in this case.

I

For reasons that escape me, this court has been confronted with a veritable flood of death penalty cases involving a pernicious pattern of prosecutorial misconduct. See, *e.g., State* v. *Thompson* (1987), 33 Ohio St. 3d 1, 514 N.E. 2d 407 (misconduct resulting in vacation of death sentence); *State* v. *Williams* (1988), 38 Ohio St. 3d 346, 359-360, 528 N.E. 2d 910, 924-925 (Sweeney, J., dissenting); *State* v. *Esparza* (1988), 39 Ohio St. 3d 8, 16,

529 N.E. 2d 192, 200 (H. Brown, J., dissenting; and *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 293-299, 528 N.E. 2d 542, 560-566 (Wright, J., concurring in part and dissenting in part). One can only hope that these practices have abated as a result of the warnings contained in *DePew, supra,* at 288-289, 528 N.E. 2d at 556-557, and the deep concerns expressed by most, if not all, of the members of this court.

I am hopeful that repeating my concerns will not detract from the impact of previous treatment of this subject. Nevertheless, with a man's life at stake, I feel compelled to again write in dissent to censure a pervasive practice among far too many prosecutors — conduct that I find in direct conflict with the foundation of our system of criminal jurisprudence.

I recognize that our system often places a prosecutor in the difficult position of being a vigorous advocate for guilt and punishment while at the same time that same prosecutor must be mindful of the accused's right to a fair trial. The prosecutor's function "* * * is not to tack as many skins of victims as possible to the wall. His function is * * * to give those accused of crime a fair trial." *Donnelly* v. *DeChristoforo* (1974), 416 U.S. 637, 648-649 (Douglas, J., dissenting). See, also, EC 7-13 of the Code of Professional Responsibility.

In my view, the prosecutor in this case failed to maintain this crucial balance. The concern of improper prosecutorial influence upon a jury is particularly acute in the penalty phase of a capital case, especially where it tends to rebut a substantial amount of mitigation, as was the case here.[6] "[I]t is most important that the sentencing

---

[5] Proverbs 17:9.

[6] The evidence presented during the sentencing hearing established Bedford's low intelligence quotient (seventy), his

limited ability to read and write, his poor academic record, and his lack of a prior felony record. Expert testimony substantiated that Bedford was severely de-

phase of the [capital] trial not be influenced by passion, prejudice, or any other arbitrary factor. * * * With a man's life at stake, a prosecutor should not play on the passions of the jury." *Hance* v. *Zant* (C.A. 11, 1983), 696 F. 2d 940, 951, certiorari denied (1983), 463 U.S. 1210.

For the reasons noted below, I believe the facts here belie a finding beyond a reasonable doubt that the jury would have recommended the death penalty absent the improper arguments by the prosecution. As a result, I believe appellant was denied fundamental due process and a fair trial pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

## II

Improper conduct by the prosecutor during the penalty phase of this case falls into three main categories. Examples of this conduct are discussed below. The cumulative effect of this misconduct dictates a remand to the trial court for resentencing. "Any egregious error in the penalty phase of a death penalty proceeding, including prosecutorial misconduct, will be cause to vacate the sentence of death with a subsequent remand to the trial court for a new sentencing procedure pur-suant to R.C. 2929.06." *Thompson, supra,* at syllabus.

### A

In his argument at the penalty phase, the prosecutor showed the jury photographs that were previously admitted during the guilt phase and improperly commented upon them. Before the prosecutor readmitted the photographs at this stage, he told the jury that:

"Whatever Mr. Bedford experienced, whatever he was feeling is not grounds to take two people's lives; and I'm going to show you the photographs in the case. You've already seen them, but *I'll remind you of them because this is what the whole case is about; this is the reason we are here, okay? This is [sic] the aggravating circumstances, this is the course of conduct which brought us all here together* * * *." (Emphasis added.)

In *State* v. *Thompson, supra,* this court vacated a death sentence and remanded for resentencing for prosecutorial misconduct less severe than that found in this case. In *Thompson,* during the guilt phase of a capital case, the prosecutor presented gruesome photographic slides to illustrate expert testimony. Later, during argument in the penalty stage, the prosecutor

pressed, very dependent on others, and that his emotional state was consistent with suicide, an act he apparently contemplated the evening before the murders. Indeed, Dr. Nancy Schmidtgoessling, a clinical psychologist, explained that a love interest's rejection would be a crisis point for Bedford, although in her opinion his illness was treatable.

In an unsworn statement, Bedford recounted his tragic life story which included the murder of his father and the early death of his mother. Bedford married at fifteen and the marriage produced six children, all of whom eventually went to live with their mother when she moved out to live with another man. In addition, Bedford had consistently abused alcohol.

That the jury considered this evidence of great significance is supported by the questions it posed to the trial court. After almost twelve hours of deliberation, the jury inquired as to what would happen if it could not reach a unanimous verdict and how long it had to keep trying before a deadlock could be declared. These questions suggest that, without more, the jury could not have found these mitigating factors were outweighed by the aggravating circumstance beyond a reasonable doubt.

referred to these slides but did not show them again.

This court stated that introduction of the slides during the guilt phase was harmless error, but held that the subsequent reference to them during the penalty phase was prejudicial. "Although the prosecutor did not actually show the slides again, his entreaty that the jury should remember the slides could have had no other effect than to cause the jurors to re-experience the horror and outrage they must have felt upon viewing the slides earlier in the trial. * * *" *Thompson, supra,* at 15, 514 N.E. 2d at 420.

In the instant case, not only did the prosecutor refer to the gruesome photographs that were presented during the guilt phase, but *he actually resubmitted the photos to the jury during the penalty phase.* These photographs, including color close-ups, show Smith lying with his head in a pool of blood on the porch. In addition, several photographs show Toepfert's body lying inside the apartment with a portion of her bowels protruding. It does not take much imagination to appreciate the revulsion the jury must have felt when these photographs were again presented to it. Therefore, if the tactics used by the prosecutor in *Thompson* were prejudicial, then surely the tactics used by the prosecutor in this case warrant vacation of the death sentence and a remand for resentencing pursuant to R.C. 2929.06.

Finally and most importantly, in *State* v. *Davis* (1988), 38 Ohio St. 3d 361, 367-373, 528 N.E. 2d 925, 931-936, Justice Locher correctly pointed out that only those aggravating circumstances specifically enumerated in R.C. 2929.04(A) may be considered in imposing the death penalty. In *Davis,* we remanded the case to the trial court because the three-judge panel weighed aggravating circumstances that were outside the statute. " 'This weighing process is designed to guide the sentencing authority's discretion by focusing on the "circumstances of the capital offense and the individual offender * * *," thus reducing the arbitrary and capricious imposition of death sentences. * * * Like all penalty provisions, R.C. 2929.04(B) must "* * * be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A).' " *Id.* at 369, 528 N.E. 2d at 933, quoting *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 371, 513 N.E. 2d 744, 746-747. See, also, *Esparza, supra,* at 16, 529 N.E. 2d at 200 (Locher, J., concurring).

The presentation of the photographs during the penalty phase and the prosecutor's related statement that "this is [*sic*] the aggravating circumstances, this is the course of conduct which brought us all here together" are precisely the types of nonstatutory circumstances that *Davis* proscribes. Therefore, it is obvious that this jury could not help but weigh the "nature and circumstances" of the offense, which is clearly improper. See *Esparza, supra,* at 16, 529 N.E. 2d at 200 (Locher, J., concurring).

The prosecutorial misconduct in introducing these nonstatutory aggravating circumstances to the jury during its weighing process was prejudicial to the defendant in that it allowed the jury to arbitrarily and capriciously impose the death penalty.

B

The prosecutor misled the jury when he improperly argued that the statutory minimum sentences under a life verdict failed to assure that appellant would not be released before that sentence was served. The prosecutor told the jury:

"The law says that the parole eligi-

bility is 30 years and the parole eligibility is 20 years, and that's the way it is today; but you don't know how it's going to be a year from now, two years from now, three years from now. * * *"

The prosecutor was speculating that the present law may somehow be amended so that appellant could receive parole to shorten his sentence. As I recently stated in *DePew, supra,* at 297, 528 N.E. 2d at 564 (Wright, J., concurring in part and dissenting in part), such speculation is improper since early parole, as suggested by the prosecutor, is impossible under present law. In addition, the possibility of parole is outside the province of the jury. See *California* v. *Ramos* (1983), 463 U.S. 992, 1026, fn. 13 (Marshall, J., dissenting).

In *Farris* v. *State* (Tenn. 1976), 535 S.W. 2d 608, 614, the Tennessee Supreme Court stated that jurors should not be informed about the possibility of parole because "* * * jurors tend to attempt to compensate for future clemency by imposing harsher sentences." Similarly, in the present case, appellant was prejudiced beyond doubt because the jurors may have imposed a harsher sentence because of the prosecutor's comments. See, also, *People* v. *Brisbon* (1985), 106 Ill. 2d 342, 478 N.E. 2d 402 (reference to possibility of early parole); and *People* v. *Davenport* (1985), 41 Cal. 3d 247, 221 Cal. Rptr. 794, 710 P. 2d 861 (comment on possible commutation).

### C

Quoting from the United States Supreme Court decision of *Gregg* v. *Georgia* (1976), 428 U.S. 153, 183, the prosecutor in this case told the jury during the penalty phase that "* * * capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs." The prosecutor then quoted from the concurring opinion of Justice Stewart in *Furman* v. *Georgia* (1972), 408 U.S. 238, 308, which states:

"* * * The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy — of self-help, vigilante justice, and lynch law."

We have held that "[a] closing argument that goes beyond the record may constitute prejudicial error, * * * particularly where the remarks call for the jury to convict to meet a public demand." *State* v. *Moritz* (1980), 63 Ohio St. 2d 150, 157, 17 O.O. 3d 92, 96-97, 407 N.E. 2d 1268, 1273.

The above quotations, particularly the passage from the *Gregg* opinion, are being used more and more frequently by prosecutors in the penalty phase of capital cases, both in this state and elsewhere. This is a practice that I find improper.

In *Wilson* v. *Kemp* (C.A. 11, 1985), 777 F. 2d 621, the United States Court of Appeals analyzed the use of such a quotation during the penalty phase of a capital trial and found that such use, combined with other improper comments, constituted reversible error. In addressing the prosecution's use of the very same *Gregg* excerpt quoted in this case, the court stated:

"As used by the prosecutor, the *Gregg* passage conveys the impression that 'this function' — *i.e.,* capital

punishment — is 'essential in an ordered society.' By contrast, the Supreme Court's intended meaning was quite different, as shown by a reading of the entire *Gregg* passage in context. The intended meaning was that recognition of the function of retribution is 'essential in an ordered society.['] * * * [O]ne need only read the relevant portion of the prosecutor's closing argument to appreciate its message: the United States Supreme Court has stated that in its view, capital punishment is essential in an ordered society. The fact that many states and countries do not have capital punishment and yet enjoy ordered societies belies this conclusion, which in any event has never been expressed by the Supreme Court. * * * [A] review of the entire context of the *Gregg* opinion shows that this was not the Supreme Court's intended meaning. Therefore, we conclude that the prosecutor's misleading use of the passage was improper argument * * *." *Id.* at 625.

In Ohio, the sentencing jury's responsibilities are limited. At the penalty phase, the jury must first determine whether or not any mitigating factors have been established. Then the jury must weigh against the existing mitigating factors the aggravating circumstance(s) of which it convicted the defendant at the guilt phase of the trial. If the aggravating circumstance(s) outweigh the mitigating factors beyond a reasonable doubt, then the death penalty is required. Otherwise, the jury recommends a sentence of life, with either twenty or thirty years of actual incarceration prior to parole consideration. R.C. 2929.03(D).

Thus, any opinion of the United States Supreme Court as to the desirability of the death penalty is completely irrelevant to the decision to be made by the jury. The only possible purpose for injection of the *Gregg* quotation is a thinly veiled attempt to advise the jury that the Supreme Court condones the death penalty as the proper response to a public demand for retribution. This, in my view, is constitutionally impermissible.

Therefore, for the foregoing reasons, I must dissent with respect to the sentence imposed, but would uphold the jury's finding of guilt.

SWEENEY and H. BROWN, JJ., concur in the foregoing dissenting opinion.