RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DANIEL BEDFORD,

        *Petitioner-Appellant,*

     *v.*

TERRY COLLINS,

        *Respondent-Appellee.*

No. 07-3737

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 92-00547—George C. Smith, District Judge.

Argued: April 22, 2009

Decided and Filed: June 4, 2009

Before: BOGGS, Chief Judge; SUTTON and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Linda E. Prucha, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, for Appellant. Matthew A. Kanai, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Linda E. Prucha, OHIO PUBLIC DEFENDER'S OFFICE, Columbus, Ohio, Karl H. Schneider, MAGUIRE & SCHNEIDER, Columbus, Ohio, for Appellant. Daniel R. Ranke, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. A jury convicted Daniel Bedford of the aggravated murder of Gwen Toepfert and the murder of John Smith, and at the jury's recommendation a state trial court sentenced him to death. The Ohio courts affirmed his convictions and sentence on direct review and denied postconviction relief. Bedford sought a writ of habeas corpus under 28 U.S.C. § 2254, which the district court denied. We affirm.

I.

In 1978, Bedford met Toepfert, whose father owned the bar where Bedford worked, and for the next several years the two were involved in an "on-again, off-again" relationship. JA 491. By 1984, they were estranged. *See State v. Bedford*, 529 N.E.2d 913, 915 (Ohio 1988).

Bedford's feelings for Toepfert remained, however, prompting him to try to "rekindle [their] prior romance." *Id.* On April 21, 1984, he visited her apartment bearing a gift and hoping to make amends—only to learn that Toepfert's new boyfriend, John Smith, was already there. *Id.* Three days later, Bedford tried again. At around 2:30 a.m. on Tuesday, April 24, Bedford, who had spent the evening working at one bar and patronizing another, telephoned Toepfert's apartment—only to learn from her roommate, Jo Ann Funk, that Toepfert was asleep and that Smith was with her. *Id.*

Later that morning, Funk woke to the sounds of "gunshots and screams." *Id.* Apparently overcome by Toepfert's rejection, Bedford entered her apartment armed with a .38 revolver and a shotgun, shot Smith after a brief struggle and shot Toepfert. During the melee, Toepfert ran into Funk's bedroom, screaming that she had been shot. Bedford found her there and shot her again with the revolver and the shotgun. Smith and Toepfert died from the gunshots. *See id.*

Bedford fled to Tennessee. Once there, he visited an acquaintance, to whom he confessed his crime, and who reported Bedford to the police. After Tennessee police arrested Bedford (and Mirandized him), he gave a statement admitting the crimes and eventually gave a similar statement to Cincinnati authorities. *Id.*

An Ohio jury convicted Bedford of the aggravated murder of Toepfert and the murder of Smith. *Id.* at 916. After a mitigation hearing, the jury recommended the death penalty, and the trial court agreed. *Id.* On direct review, the state court of appeals and the Ohio Supreme Court affirmed Bedford's conviction and death sentence. *See State v. Bedford*, No. C-840850, 1986 WL 11287, at *14 (Ohio Ct. App. Oct. 8, 1986) (per curiam), *aff'd*, *Bedford*, 529 N.E.2d at 916. Bedford sought state post-conviction relief, which the Ohio courts denied. *See State v. Bedford*, No. C-900412, 1991 WL 175783 (Ohio Ct. App.

Sept. 11, 1991) (per curiam), *appeal denied*, *State v. Bedford*, 583 N.E.2d 1320 (Ohio 1992). He filed a motion for reconsideration and another seeking reinstatement of his direct appeal, both to no avail. *See State v. Bedford*, 626 N.E.2d 957 (Ohio 1994); *State v. Bedford*, 622 N.E.2d 656 (Ohio 1993).

In 1992, Bedford filed a federal petition for habeas corpus in the district court. As amended, his petition raised 87 separate grounds for relief. In a pair of thorough opinions spanning 251 pages, the district court denied each of Bedford's claims. Most of the claims, the court concluded, were procedurally defaulted or otherwise not cognizable in federal court, and the remainder failed on the merits. The court granted a certificate of appealability on several claims. *See Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

## II.

Because Bedford filed his federal habeas petition before AEDPA's effective date, AEDPA's standard of review does not apply, *see Lindh v. Murphy*, 521 U.S. 320, 336 (1997). We thus give fresh review to the state courts' legal conclusions and clear-error review to their fact findings. *See Fitzgerald v. Withrow*, 292 F.3d 500, 503 (6th Cir. 2002).

### A.

Bedford first claims that the trial court unfairly limited his questioning of prospective jurors during voir dire: (1) by too quickly dismissing four prospective jurors for cause that he wished to rehabilitate and (2) by precluding his counsel from asking certain questions of the jurors.

#### 1.

A prospective death-penalty juror may be struck for cause if he is "substantially impaired in his . . . ability to impose the death penalty under the state-law framework." *Uttecht v. Brown*, __ U.S. __, 127 S. Ct. 2218, 2224 (2007). That includes jurors who express an unwillingness to recommend the death penalty, no matter what the weighing of aggravating and mitigating factors suggests. *See Dennis v. Mitchell*, 354 F.3d 511, 522–23 (6th Cir. 2003).

The four dismissed jurors each expressed views that qualified them as "substantially impaired." Juror Herweh told the court that he "definitely" did not think he could sign a death-penalty recommendation, JA 2192, even if the aggravating factors outweighed the mitigating factors. Juror Tucker did not think she "could be a part of convicting someone to the death sentence," would not recommend a death sentence under any circumstance and could "not follow [a] law" requiring her to do so. JA 2132–34. And Jurors Dotterweich and Jordan stated that they could not sign a verdict recommending the death penalty. Based on these statements, the trial court had ample cause to excuse each juror, *see Dennis*, 354 F.3d at 522–23, a view amplified by the considerable deference we give to the trial court's on-the-ground assessment of each juror's capacity to serve. *See Uttecht*, 127 S. Ct. at 2224; *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003).

Bedford counters that his counsel might have rehabilitated the jurors had the trial judge not cut short each colloquy. But the court *did* allow Bedford's lawyers to follow up with questions after initial inquiries elicited disqualifying responses, and each time the additional questions confirmed the juror's unwillingness to sign a death verdict.

The question, then, is not whether the trial court was required to permit follow-up questions; it is whether the court was required to permit still *further* follow-up questions. Bedford contends that, had the jurors been reminded that their task required them only to make a *recommendation* to impose the death penalty the jurors might have modified their views. But Bedford's counsel *did* mention to all four jurors that they would make only a recommendation.

Bedford adds that further questioning might have shown that the jurors were "simply confused" about the task before them, not unwilling to do their duty. Br. at 112. But chalking up the jurors' statements to confusion does not help Bedford, because voir dire responses that signal serious confusion about the jury's role in the process suffice to excuse a juror. *See Morales v. Mitchell*, 507 F.3d 916, 941–42 (6th Cir. 2007).

Even if Bedford could show that the trial court erred in excusing the jurors, at any rate, he still could not obtain relief. To prevail, he must show not only that the trial court's decision was incorrect but also that it resulted in an actually biased jury. *Hill v. Brigano*, 199 F.3d 833, 844–45 (6th Cir. 1999). Yet Bedford has not alleged, let alone proved, that

the jury that convicted him was biased. *Wilson v. Mitchell*, 498 F.3d 491, 514 (6th Cir. 2007).

2.

Also unavailing is Bedford's claim that the trial court improperly limited the scope of questioning at voir dire. The Constitution "does not dictate a catechism for *voir dire*, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). Neither due process nor the Sixth Amendment entitles a defendant to ask prospective jurors every question that might prove helpful. *Mu'Min v. Virginia*, 500 U.S. 415, 425–26 (1991). What matters is whether the defendant's inability to ask a question renders the proceeding "fundamentally unfair" by making it impossible to identify an unqualified juror. *Id.* at 426. And in answering that question, we again remain mindful that the trial court's vantage point gives it a superior perspective to assess which inquiries will be fruitful in uncovering bias and which will not be. *See Morgan*, 504 U.S. at 729.

The court gave each side ample opportunities to explore the venire members' views—devoting five days (spanning nearly 900 pages of transcript) to the task. Nor did it restrict either side to abstract questions about whether a juror would follow instructions or perform his duties impartially, *cf. Morgan*, 504 U.S. at 734–35; it allowed the parties to press jurors about their attitudes.

The trial court, it is true, drew the line at questions that sought to elicit the jurors' views on Bedford's specific case—but many judges understandably (and properly) would do the same thing to prevent the lawyers from previewing their case through voir dire. *Cf. United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002); 6 Wayne R. LaFave et al., *Criminal Procedure* § 22.3(a) n.5 (3d ed. 2007). The court allowed defense counsel to ask whether a juror would consider a specific fact at all during the sentencing phase, whichever way that fact might cut, but it barred Bedford's lawyers from asking whether a juror would find that fact to be mitigating. The court allowed his lawyers to explore each juror's general attitudes about the death penalty, but it did not permit them to ask for what crimes the juror thought it appropriate or whether death always would be warranted for intentional homicide. And it allowed counsel to ask whether a juror thought various alternatives to the death

penalty such as prison time were "serious" punishments, but it did not let them ask whether such sentences would be "serious" for defendants who committed murder. JA 2165, 2223.

These limitations did not render the process fundamentally unfair. *See Dennis*, 354 F.3d at 523–25 (upholding similar restrictions). They reflect instead a reasonable effort to enable adequate exploration of juror biases (on the one hand) while preventing counsel from extracting commitments from individual jurors as to the way they would vote (on the other). Cabining counsel's questions in this way did not block Bedford from uncovering a juror's unwillingness to consider relevant factors, nor did it inhibit him from exploring any avenues where bias might lurk. It merely prevented Bedford's counsel from mapping every alley and side street of each juror's mind, a level of detail that the Constitution does not entitle criminal defendants (or the prosecution) to obtain.

B.

Bedford next claims that the prosecutor's closing arguments at the guilt and penalty phases violated due process. To prevail, Bedford must show that the prosecutor's remarks were not just improper but that they were "flagrant." *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). Flagrancy turns on content and context: (1) whether the comment was likely to mislead the jury or otherwise prejudice the defendant; (2) whether it was an isolated occurrence or part of an extensive pattern; (3) whether it was made deliberately or by accident and (4) whether the prosecution's other evidence was strong. *See id.*

*Guilt phase*. Bedford complains about comments by the prosecutor in closing argument at the guilt phase that allegedly disparaged defense counsel's tactics. The prosecutor called "[s]ome" of Bedford's "arguments" "Mickey Mouse defenses," JA 2301, and he characterized others as attempts to "confuse" the jury by "fill[ing] the courtroom with as much smoke as you possibly can," JA 2304, casting aspersions "all around the courtroom" and putting "everyone on trial in the case except our little boy over here"—all in the hope that the jury would "lose sight of the real issues in the case," JA 2315. Attempting to deflate an attempt by the defense to discredit a particular government witness, the prosecutor also predicted that the witness would "be dragged through the mud by the defense." JA 2258.

These comments were not improper. The prosecution necessarily has "wide latitude" during closing argument to respond to the defense's strategies, evidence and arguments. *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008); *see Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). How far the government may go, true enough, depends on what the defense has said or done (or likely will say or do). *See United States v. Young*, 470 U.S. 1, 12–13 (1985). And in all events the prosecutor may not simply belittle the defense's witnesses or deride legitimate defenses, *see Slagle v. Bagley*, 457 F.3d 501, 522 (6th Cir. 2006); *Gall v. Parker*, 231 F.3d 265, 314–16 (6th Cir. 2000), *abrogated on other grounds as recognized in Bowling v. Parker*, 344 F.3d 487, 501 n.3 (6th Cir. 2003), nor may he offer his own opinion about a witness's credibility, *see Cristini v. McKee,* 526 F.3d 888, 901 (6th Cir. 2008). But the prosecutor's remarks in this case—all made in the course of the fast-moving thrust and parry of a criminal trial—did no more than respond to Bedford's actual and reasonably likely contentions and tactics. *See United States v. Bernard*, 299 F.3d 467, 487–88 (5th Cir. 2002); *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992).

Several of the prosecutor's comments, Bedford adds, were calculated to incite the jury's passions and were engineered to elicit an emotional, not a reasoned, reaction to the evidence. Responding to the defense theory that Bedford's conduct was the culmination of an unplanned outburst—fueled by alcohol and emotion and sparked by a life-threatening confrontation with Toepfert's new paramour—the prosecutor argued: (1) that the evidence, including graphic photographs of Toepfert's and Smith's bodies, proved Bedford's conduct was purposeful and planned; (2) that Bedford's inner "demon"—his alcohol dependence—was not responsible for his behavior, as the only "demon in this case" was Bedford and (3) that the jurors' duty required finding Bedford guilty and that, if they did so, each juror could say to himself "I did Gwen justice and I did Johnny justice," JA 78.

These comments did not deprive Bedford of a fair trial. By alluding to the victim photographs, already admitted into evidence, and arguing that they established Bedford's intent, the prosecutor permissibly sought to draw an inference from the evidence. *See Byrd*, 209 F.3d at 535. Calling Bedford a "demon" comes closer to the line—it was unnecessary and unprofessional—but it goes no further than similar comments that have not required setting aside a state conviction. *See Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (holding that prosecutor's deliberate, repeated references to defendant as a "deadbeat," a

"thief," a "creep" and a "liar" did not violate due process); *see also Byrd*, 209 F.3d at 536 (same regarding prosecutor's repeated references to defendant as a "predator").

Neither did the prosecutor overstep by urging the jury to do justice for Smith and Toepfert. Nothing prevents the government from appealing to the jurors' sense of justice, *see Coe v. Bell*, 161 F.3d 320, 351 (6th Cir. 1998), or from connecting the point to the victims in the case, *cf. Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004). The prosecution, to be sure, may not urge jurors to identify individually with the victims with comments like "[i]t could have been you" the defendant killed or "[i]t could have been your children," *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008), nor may it fan the flames of the jurors' fears by predicting that if they do not convict, a crime wave or some other calamity will consume their community, *see United States v. Solivan*, 937 F.2d 1146, 1152–53 (6th Cir. 1991). But the prosecutor did no such thing here.

*Penalty phase*. In arguing that the prosecutor's penalty-phase summation contained unfairly prejudicial comments, Bedford targets the following: (1) The prosecutor reminded the jury that they make only a recommendation, not a final decision, on Bedford's sentence; (2) he read a passage from *Gregg v. Georgia*, 428 U.S. 153 (1976), concerning the death penalty's role in society; (3) he suggested that it was "unpleasant" for Bedford's counsel to represent him, JA 2432; (4) he redisplayed photographs of both victims and argued that they established an aggravating circumstance; (5) he speculated that despite the minimum imprisonment under current law, Bedford might be paroled sooner and (6) he commented on Bedford's unsworn in-court statement.

We can quickly dispatch with Bedford's complaints about the first four comments. There was nothing improper about accurately explaining to the jury that, under Ohio's death-penalty scheme, they recommend—but do not definitively determine—the defendant's sentence. *Hicks*, 384 F.3d at 223. That was an accurate statement of the law. *See id.*; *see also Coleman v. Mitchell*, 268 F.3d 417, 435–36 (6th Cir. 2001). It was not improper—and in any case did not render the trial fundamentally unfair—to quote from the Supreme Court's opinion in *Gregg* to support the State's argument that the death penalty is consistent with, and in some instances necessary to, an ordered society. *Cf. Byrd*, 209 F.3d at 538–39. That, too, was an accurate statement of what the Supreme Court said. Nor did the prosecutor's

reference to the unpleasantness of representing Bedford cross the line.  Viewed in context, the prosecutor did no more than urge the jurors not to shrink from their difficult duty even though the process was "unpleasant" for all involved—prosecutors, defense counsel and jury included.  JA 2432.

The prosecutor also did not overstep by using the pictures of the victims as evidence of an aggravating circumstance.  True, only Bedford's conviction for Toepfert's aggravated murder carried a death specification, *see Bedford*, 529 N.E.2d at 915–16, and yet the pictures depicted Toepfert *and* Smith.  But the specification itself—the fact that Toepfert's murder was "part of a course of conduct involving the purposeful killing of . . . two or more persons," Ohio Rev. Code § 2929.04(A)(5) (1994)—made Smith's murder relevant, and thus by putting pictures of Smith before the jury again the prosecutor did not invite them to consider a non-statutory aggravating factor.  *See also Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) (consideration of non-statutory aggravating factors, even if contrary to state law, does not violate Federal Constitution).  Nor was it improper to use the photographs to make the point:  The jury saw the images during the guilt phase, and the prosecution may use victim-impact evidence at sentencing, *see Beuke v. Houk*, 537 F.3d 618, 648 (6th Cir. 2008).

The remaining two statements require more explanation.  The prosecutor suggested that, even though under then-existing state law a life sentence would keep Bedford behind bars for 20 or 30 years before he could obtain parole, the law could change, enabling Bedford to obtain parole sooner.  That statement is similar to informing the jury that if it selects a life sentence, state officials might commute the sentence to a shorter term.  So long as the jury receives accurate information, it may consider the possibility, speculative though it may be, that future decisions of state executive officials could lead to the defendant's early release.  *See California v. Ramos*, 463 U.S. 992, 1001–03 (1983).

Even if we assumed for the sake of argument that the prosecutor's comments crossed the line, they were not sufficiently flagrant to make Bedford's trial unfair.  *Cf. Carson*, 560 F.3d at 574.  The prosecutor's statement, for one thing, was unlikely to mislead the jury:  The prosecutor said nothing untruthful—Ohio's General Assembly, or state or federal courts, could change the application of life sentences in the future—and both the trial court and the defense made the current law clear to the jury.  The remark also was isolated, and it may

have been accidental, as the prosecutor appeared to downplay the point almost immediately. The other evidence relevant to the jury's sentencing decision also was strong. As the Ohio Supreme Court observed, the evidence showed that Bedford could distinguish right from wrong, considered his conduct in advance, lay in wait for his victims and after shooting Toepfert once returned twice to shoot her again. *See Bedford*, 529 N.E.2d at 924.

Bedford's claim about the prosecutor's comments on his unsworn statements fares no better. Under the Fifth (and Fourteenth) Amendment, the prosecution ordinarily may not comment on a defendant's refusal to testify. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *Durr v. Mitchell*, 487 F.3d 423, 443 (6th Cir. 2007). Ohio law, however, adds a wrinkle: It allows a capital defendant, at his option, to make an unsworn statement at the sentencing phase, which is not subject to cross-examination. *See* Ohio Rev. Code § 2929.03(D)(1). When the defendant exercises that option, we have held that the prosecution may "*remind*[] the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *Durr*, 487 F.3d at 443 (internal quotation marks omitted and emphasis added). But the prosecution may go no further and may not disparage the defendant's decision not to testify under oath. *See id.*; *DePew v. Anderson*, 311 F.3d at 742, 750 (6th Cir. 2002).

After noting that Bedford's statement was unsworn and not subject to cross-examination, the prosecutor continued:

> . . . I think because of that you can judge his credibility and the things that he had to say to you with a jaundice[d] eye because even if a person is under oath, you don't have to believe what they say . . . . And the mere fact that this man elected to avoid being scrutinized by the prosecutor in this case should be considered by you.

JA 2434. Whether that comment was improper is a close call. The only point of allowing the prosecution to remind the jury that the defendant's statement was not made under oath, after all, is to enable the State (since it cannot cross-examine him) to challenge his credibility. At least the first part of the prosecutor's comment seemed trained on that objective, encouraging the jury to question the truthfulness of what Bedford *did* say, not his refusal to testify under oath on another subject. *Cf. DePew*, 311 F.3d at 749–50 (holding improper prosecutor's statement that the defendant's decision to give unsworn statement but not to undergo cross-examination under oath prevented the prosecutor from questioning him

about a different subject). The last part of his comment, however, may have gone too far, arguably inviting the jury to draw an adverse inference from the fact that Bedford never testified under oath at all. *Cf. Durr*, 487 F.3d at 443, 445.

Even assuming the prosecutor crossed the line, however, any violation was not flagrant. The likelihood that the jury was misled was low, as the court and the prosecutor told the jury Bedford was entitled to make an unsworn statement. The comment was isolated, and the prosecution's other evidence was plentiful. The potential for prejudice was reduced still further by the fact that the state trial and appellate courts independently weighed the aggravating and mitigating circumstances. *Bedford*, 529 N.E.2d at 916, 923–24; *see Lundgren v. Mitchell*, 440 F.3d 754, 783 (6th Cir. 2006). Even if improper, in short, the prosecutor's comments do not require setting aside Bedford's sentence.

Before turning to Bedford's next argument, we must acknowledge one oddity about this analysis. Simply put, it is strange to think of Bedford's contention in conventional Fifth Amendment terms. The guarantee says that an individual shall not "be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Yet this issue arose not because the prosecution compelled Bedford to testify or because he exercised his right to remain silent and the prosecution disparaged his silence—the classic settings in which Fifth Amendment violations arise—but because Bedford *did* speak to the jury. Bedford voluntarily invoked a state allocution procedure that federal law does not require and that allowed him to make an unsworn statement to the jury during the penalty phase. At least ten States by our rough count have similar procedures that apply at the penalty phase of capital cases. *See Jeffries v. Blodgett*, 5 F.3d 1180, 1191–92 (9th Cir. 1993) (applying Washington law); *People v. Borrego*, 774 P.2d 854, 856 (Colo. 1989); *Shelton v. State*, 744 A.2d 465, 496–97, 501–03 (Del. 2000); *Booth v. State*, 507 A.2d 1098, 1111–12 (Md. 1986), *vacated on other grounds*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991); *State v. Zola*, 548 A.2d 1022, 1046 (N.J. 1988), *superseded by statute on other grounds as stated in State v. Delibero*, 692 A.2d 981, 987 (N.J. 1997); *Homick v. State*, 825 P.2d 600, 603–05 (Nev. 1992); *State v. Herrera*, 694 P.2d 510, 516 (N.M. 1985); *State v. Wilson*, 985 P.2d 840, 843–44 (Or. App. 1999); *Bassett v. Commonwealth*, 284 S.E.2d 844, 853–54 (Va. 1981); Idaho Death Penalty Criminal Jury Instruction 1709 (2005); *see also Jones v. State*, 381 So.2d 983, 993–94 (Miss. 1980); *State v. Young*, 853 P.2d 327, 372

(Utah 1993) (opinion of Durham, J.). And because these procedures are creations of the States, the States are fully entitled to adopt an assortment of limitations on the exercise of the right as well as limitations on what the prosecution may say about a defendant's exercise of the right.

Why any of this raises an issue of federal law in this case, however, is not self-evident. Doubtless, the invocation of the state-law right could implicate the Fifth Amendment if the prosecution insisted on cross-examining the defendant about *other* crimes. *See, e.g.*, *DePew*, 311 F.3d at 749–50. Or the invocation of this state-law right could implicate the Sixth Amendment if the prosecution violated state-law rules about the allocution procedure and defendant's counsel unreasonably failed to object. *See, e.g.*, *Durr*, 487 F.3d at 443, 445. But it is far from obvious why the Fifth Amendment, as opposed to state law, constrains a prosecutor who wishes to comment not on a defendant's silence but on his voluntary choice to speak. As the above analysis confirms, we need not decide the case on this ground, and therefore we have not done so. We simply register the observation in the event future litigants or panels of the court may profit from it.

## C.

Bedford next argues that the trial court gave an unduly coercive *Allen* charge to the jury during the penalty phase. A day into its deliberations, the jury sent a note to the court asking "what would happen" if the jury could not reach a unanimous sentencing recommendation and whether there was "an approximate time frame" for reaching a decision. JA 2462. After consulting with the parties, the court responded with a supplemental instruction informing the jury that there was no fixed time limit but urging the jurors to "make every reasonable effort to agree on a recommendation," given the time and energy already invested in the trial and the jurors' superior position (having already participated in the guilt phase) to make a fair decision. JA 2468. The court "suggest[ed]" that the jury first determine whether they were in fact deadlocked and, if so, to return a life-sentence recommendation. JA 2469.

The question is whether the instruction, viewed in context, was "coercive." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988) (internal quotation marks omitted); *see Mason v. Mitchell*, 320 F.3d 604, 640 (6th Cir. 2003). Bedford says it was for several

reasons: it omitted the standard language directing all jurors—the majority and minority—to reconsider their views; it failed to caution them not to abandon their conscientiously held views; and it misled the jury by suggesting that if they could not reach a decision, another jury would take up their task, when in reality a deadlock would force the judge to impose a life sentence.

By instructing the entire jury to make every reasonable effort to agree on a recommendation if they could do so in good faith, the trial court at least implicitly encouraged all of the jurors to reconsider their positions. Yes, the court did not explicitly direct the majority and the minority to do so. But that did not make the charge coercive. Reminding both sides of a split jury to remain open-minded no doubt may ensure that those in the minority are not singled out and pressured to acquiesce in the majority's view, *see Williams v. Parke*, 741 F.2d 847, 850 (6th Cir. 1984), and it may prevent those in the majority from dismissing their own reservations or second thoughts as counterproductive. But a general instruction, addressed to all jurors, suffices so long as it does not imply that only those in the minority should rethink their position. *See id.* at 850–51.

Nor was the charge coercive because it omitted a caution that the jurors not abandon their honest convictions. There is no iron-clad rule that a trial court's failure to include that reminder, though unfortunate and ill-advised, is invariably fatal to the conviction. *See id.* at 851. In this case, the trial court had instructed the jurors only the day before in its general charge not to "surrender honest convictions" in the interest of consensus. JA 2449. And although it could have done so more clearly, the court's supplemental instruction alluded to the need to hold on to conscientiously held views. *See* JA 2468–69 (instructing the jurors "to make every reasonable conscien[tious] effort" to agree on a recommendation if possible).

The lack of other coercive language in the charge also diminished the need for an honest-conviction caveat. The reminder serves primarily to counterbalance the potentially coercive effect of the rest of the instruction, and the need for it depends on what sits on the other side of the scale. Here, the trial court responded to the jurors' questions by informing them that there was no set time limit to reach a consensus, encouraging them to make reasonable efforts to agree and suggesting how they might proceed. The court never intimated that the jury had to reach agreement, instead explaining only what to do if

consensus proved impossible. *Cf. Williams*, 741 F.2d at 850. Nor did it browbeat the jurors with concerns about the inconvenience to the court or the costs of delay. *Cf. United States v. Scott*, 547 F.2d 334, 337–38 (6th Cir. 1977).

The trial court's explanation of what would happen if the jury deadlocked also did not make the instruction coercive. The first part of the instruction, we realize, was inaccurate. It indicated that the court would declare a mistrial and call another jury in its place if the jury could not agree, even though Ohio law requires a judge confronted with an "irreconcilably deadlocked" jury to impose a life sentence, not empanel a new jury to start over. *See State v. Springer*, 586 N.E.2d 96, 100 (Ohio 1992); *Mason*, 320 F.3d at 641. But the trial court quickly corrected its mistake, clarifying that if the jury deadlocked, they should return a life-sentence recommendation. Despite its shortcomings, the trial court's charge does not require setting aside Bedford's sentence.

D.

Bedford claims that his attorneys' representation at both phases of the trial was constitutionally ineffective. To prevail, he must show that their performance was deficient and that, but for their poor performance, "there is a reasonable probability" the result would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Bedford argues that his counsel should have objected to prosecutorial misconduct and incorrect jury instructions. As for their failure to object to the prosecutors' guilt- and penalty-phase closing arguments, that did not constitute ineffective assistance because the comments were not flagrant. *See Slagle*, 457 F.3d at 514.

As for the jury instructions, even if the court's directions were incorrect, they did not render his trial fundamentally unfair. *See Lawrence v. 48th Dist. Court*, 560 F.3d 475, 484 (6th Cir. 2009). In instructing the jury that it could consider "any other factors that are relevant" to whether Bedford should receive the death penalty, JA 2448, the court merely quoted the statute's catchall provision, *see* Ohio Rev. Code § 2929.04(B)(7); *see also Boyde v. California*, 494 U.S. 370, 381–82 (1990). The definition of mitigating factors the court gave—equating mitigation with reducing the defendant's blameworthiness—exceeded what Ohio courts allow, *see, e.g.*, *State v. Frazier*, 873 N.E.2d 1263, 1295–96 (2007). But the

error was harmless under federal and Ohio law given the state courts' independent reweighing of the aggravating and mitigating factors. *See Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007); *State v. Holloway*, 527 N.E.2d 831, 835 (Ohio 1988). As for his claims that the court "divided" the one death specification into two and that it told the jury that "the facts of the case were an aggravating circumstance," Br. at 79, he is simply mistaken: The trial court did neither in its penalty-phase instructions.

Bedford also argues that the court should have given (and his counsel should have requested) an instruction at the outset that if the jury could not agree, they must impose a life sentence. But the trial court in fact instructed the jury to impose a life sentence if they could not agree. A death-penalty defendant, at any rate, has no constitutional entitlement to an instruction informing the jury of the effect of a deadlock. *See Jones v. United States*, 527 U.S. 373, 381–82 (1999).

Bedford also argues that his attorneys failed adequately to prepare and present mitigating evidence. In its detailed discussion of this claim, the district court explained why his counsel's investigation was adequate and why their decisions about what witnesses and evidence to present reflected reasonable choices. We have nothing to add to its analysis on that score and cannot improve on it. We instead address only why the defense counsel's conduct, even if it were deficient, did not prejudice Bedford.

To establish prejudice flowing from deficient penalty-phase preparation and presentation, the defendant must show that the evidence his attorneys should have discovered and put forward "differ[s] in a substantial way—in strength and subject matter—from the evidence actually presented." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005). Bedford has not made that showing.

The jury heard mitigating evidence from four witnesses. Dr. Donna Winter, a clinical psychologist who had examined Bedford, testified in the guilt phase that Bedford had a history of chronic depression dating back a decade, exhibited "extreme stress" reflecting a "cry-for-help profile" in psychological tests, JA 2228, had a "borderline mentally retarded" IQ of 76, JA 2229, and would have had great difficulty handling the emotional and psychological strain (not helped by his alcohol consumption) caused by Toepfert's rejection and his encounter with Smith. At the penalty phase, Dr. Nancy Schmidtgoessling elaborated

on Bedford's emotional instability—and the volatility his alcohol intake added to the mix—but she also underscored that he was "one of the more treatable" inmates she had encountered. JA 2352. Winter and Schmidtgoessling each prepared written reports—which they discussed in their testimony and which the jury was entitled to review, *see* Ohio Rev. Code § 2929.03(D)(1)—that fleshed out their findings and filled in details of Bedford's troubled personal and family history.

Bedford's attorneys also presented the testimony of Jackie Schmidt, a friend and former girlfriend of Bedford's, who spent several hours with him the night before the murders and who confirmed his frayed emotional state. Bedford, who had been drinking a great deal, was deeply upset over Toepfert's rejection, to the point of crying, and at one point he played Russian roulette with a loaded gun.

Finally, in his own (unsworn) testimony, Bedford told his life story, from his parents' deaths while he was still young to his teenage marriage, his inability to care for his six children, his difficulty holding a job and maintaining healthy relationships and his long-running dependence on alcohol. Bedford described his relationship with Toepfert, his memory of the murders (much of which he could not recall) and his confession.

The evidence Bedford now says his lawyers overlooked (or never uncovered) does not differ "markedly" in strength or subject matter from the evidence they presented. *Hill*, 400 F.3d at 319, 331–32. Bedford argues that his attorneys should have put on testimony from various members of his family, but their accounts largely duplicated what Bedford and the psychologists had already told the jury—describing Bedford's parents, his alcoholism, his unsuccessful marriage and inability to care for his children—and added no critical pieces to the puzzle. *Cf. Carter v. Mitchell*, 443 F.3d 517, 530–31 (6th Cir. 2006); *Clark v. Mitchell*, 425 F.3d 270, 286–87 (6th Cir. 2005). Not calling Bedford's ex-wife as a witness not only avoided similar redundancy but also avoided the risk that she would reveal Bedford's history of abusing her when intoxicated. Nor has Bedford shown what value engaging a mitigation specialist to oversee an investigation of his background would have added. *Cf. White v. Mitchell*, 431 F.3d 517, 529–30 (6th Cir. 2005).

Neither did the additional expert assessments differ substantially from what the jury heard. Schmidtgoessling, who was appointed to examine Bedford for purposes of a possible

insanity plea, stated that, had she evaluated Bedford with mitigation in mind, she would have included additional facts from Bedford's "social history." JA 1694. But the facts she describes differ only marginally from the story the jury did hear, and although she might have connected the dots more closely, none of the links likely would have led the jury to a different conclusion.

Schmidtgoessling's testimony, it is true, did not address the fact that Bedford allegedly had been "eating speed like candy" the two nights before the murders, JA 1691—a fact Schmidtgoessling herself did not know when she testified. But Bedford's *attorneys* apparently were also unaware of this fact, as neither Jackie Schmidt (who brought this fact to light in her postconviction affidavit) nor Bedford himself told them about it when asked by counsel what drugs Bedford consumed before the murders. (Schmidt mentioned only alcohol, and Bedford mentioned alcohol and marijuana.)

Two other experts—Dr. Thomas Heiskell, a clinical psychologist, and Dr. James Tanley, a neuropsychologist—critiqued the accounts Schmidtgoessling and Winter offered at trial and suggested Bedford's counsel should have arranged for more rigorous testing. But even assuming they are right, Bedford suffered no cognizable prejudice. Heiskell and Tanley raised only the *possibility* that more testing would have revealed other psychological or neurological problems, and neither highlighted any substantially different or stronger evidence of impairment that could have turned the tide. Each one, for instance, indicated that Bedford's experts should have explored the possibility of organic brain damage, and Winter stated she would have pursued the possibility if she had received more information, but none of them concluded based on subsequent examinations that Bedford actually had brain damage at the time of the crime that more testing would have uncovered. *See Smith*, 348 F.3d at 202.

Bedford adds that the district court erred in denying his request for an evidentiary hearing regarding evidence his attorneys failed to explore or present. *See* 28 U.S.C. § 2254(d) (1994). The issues he seeks to develop, however, pertain to the adequacy of his counsel's performance, and there is no need to build a record on that issue because, as noted, he cannot show his attorneys' performance prejudiced him. *See Ivory v. Jackson*, 509 F.3d 284, 298 (6th Cir. 2007).

III.

For these reasons, we affirm.