NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0216n.06

Case No. 25-5753

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 18, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| STANLEY ANYANWU, | ) | TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: MOORE, WHITE, and THAPAR, Circuit Judges.

THAPAR, Circuit Judge. Stanley Anyanwu participated in a conspiracy that defrauded victims out of millions of dollars. He helped funnel the proceeds of online scams through multiple bank accounts so that victims never saw their money again. As a result, he was convicted of conspiracy to commit wire fraud and money laundering. He now challenges his conviction, arguing that the district court should have transferred the case to another venue. He also contends the district court didn't adequately question potential jurors. Finding no error, we affirm.

I.

A few years ago, the City of Memphis received a seemingly routine email. The CEO of one of its vendors was asking the City to make an upcoming payment to a new bank account. The CEO provided a notarized form and voided check from the new bank. So the City updated the

payment information and sent over $773,000 to the new bank account. But the email wasn't routine. It was part of a "business email compromise" scam trying to steal money from the City.

A business email compromise is a type of cybercrime where fraudsters use a seemingly authentic email to trick employees of a business or government agency into sending them money or sensitive data. In one common version, the scammers monitor the victim's emails to see when the victim is about to make a large payment. The fraudsters then email the victim, pretending to be the intended recipient of that payment, and request that the victim wire the money to a new bank account under the fraudsters' control.

Once the money is transferred, the scammers rely on a network of "money mules" to whisk those funds out of the country. R. 117, Pg. ID 778. The money mules often use shell companies, wire transfers, cash deposits, and cash withdrawals to hide the source and destination of the funds. And they typically work so quickly that banks can't pull back the funds, often leaving victims with no way to recover their losses.

One such money mule was Stanley Anyanwu. After the City of Memphis transferred the funds to the scammers' bank account, a money mule sent some of that money to a bank account that Anyanwu controlled. Anyanwu then tried wiring the money to his wife's bank account in Nigeria. But the bank rejected the transfer. So he took out two cashier's checks, deposited those checks into another bank account he controlled, and then transferred the funds to six other money mules. As a result of Anyanwu and his co-conspirators' efforts, the City of Memphis lost $773,695.

The City wasn't the only victim of this conspiracy. The fraudsters also committed romance scams in which they used social-media platforms to strike up online relationships with their targets. After developing trust with the victims, the scammers often claimed to be facing an emergency

and asked for increasingly large sums of money. For example, a woman in her late 70s met a man online who she believed was a businessman living in Dubai. The man claimed that he had some unexpected business expenses due to the COVID-19 pandemic and needed money. So he asked her to wire money to his associates, including Anyanwu. The woman then attempted to send $35,000 to Anyanwu. Fortunately, the bank stopped that transaction. But a few months later, the fraudster told the woman that he was in the hospital and needed more money before he could visit her. By the time the woman realized she was being scammed, she had taken out loans and cash advances and sent over $500,000 to the fraudsters.

As a result of Anyanwu's participation in these scams, a grand jury in the Western District of Tennessee charged him with conspiring to commit wire fraud and money laundering. Before trial, Anyanwu moved for a change of venue, arguing that the Memphis-based jury pool would be biased against him. The district court denied that motion, finding that Anyanwu's arguments were purely speculative. The district court further noted that any potential juror bias could be addressed during jury selection.

Anyanwu then prepared a list of 40 proposed questions for jury selection. The district court asked some of those questions and probed jurors about whether any of their close friends or family members had ever fallen victim to an online fraud or dating scam. The court sought to ensure that jurors would "be fair and impartial [and] make a decision based on the evidence introduced at trial." R. 139, Pg. ID 1383. After the parties selected the jury, Anyanwu didn't object.

The jury ultimately convicted Anyanwu on both counts, and the district court sentenced him to 87 months' imprisonment. Anyanwu timely appealed.

II.

On appeal, Anyanwu challenges the district court's denial of his motion to transfer venue as well as the district court's questioning of prospective jurors. We address each in turn.

A.

We review a district court's denial of a motion to change venue for abuse of discretion. *United States v. Poulsen*, 655 F.3d 492, 506 (6th Cir. 2011). Under Federal Rule of Criminal Procedure 21(a), a district court must transfer venue if the prejudice against the defendant within the district is "so great" that he "cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). A defendant seeking a change of venue must show that prejudice is a "demonstrable reality," not merely a "matter of speculation." *Poulsen*, 655 F.3d at 506 (quotations omitted). Anyanwu hasn't met that burden here.

Anyanwu asserts that prospective jurors from Memphis and the surrounding area had a personal interest in the case because they likely had to, or believed they might have to, pay more in taxes to cover the City's financial loss from the scam. But he points to nothing in the record that indicates residents of Memphis or the surrounding area ever had to, or believed they might have to, pay higher taxes because of this scheme. So his theory is based on speculation, which doesn't suffice for a change of venue.

What's more, Anyanwu asserts that *all* residents of Memphis and the surrounding area are biased against him. But we generally presume that jurors are impartial. *Frye v. CSX Transp., Inc.*, 933 F.3d 591, 604 (6th Cir. 2019). That presumption of impartiality can be overcome only when the challenging party introduces "concrete evidence" of bias. *Id.* at 605. And Anyanwu hasn't identified any concrete evidence of bias within the district. Plus, the district court repeatedly confirmed that the prospective jurors would "put aside [their] biases and make a decision in the

case based on the evidence that's introduced at the trial." R. 139, Pg. ID 1417; *see Poulsen*, 655 F.3d at 507 (explaining that questioning prospective jurors is "the primary tool for discerning actual prejudice" (quotation omitted)). In short, Anyanwu identifies nothing in the record to rebut the presumption of impartiality.

Granted, we don't always apply that presumption. For instance, we sometimes infer there's bias when the juror's relationship to the case makes it "highly unlikely" that the juror could remain impartial. *Frye*, 933 F.3d at 605 (quotation omitted). But we do so only in "extreme cases," such as when the juror is related to a party or directly involved in the events of the case. *Id.* at 604–05. Those concerns aren't present here. In fact, the cases that Anyanwu cites actually demonstrate that this isn't one of those extreme instances where we'd presume bias. One case involved a juror who had been a long-time employee of the U.S. Attorney's Office that was prosecuting the case. *United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000). The other involved a case against Wal-Mart where the juror was both a shareholder of Wal-Mart and married to a Wal-Mart employee. *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir. 1995). In contrast to those cases, Anyanwu hasn't identified a single juror who had such a close personal connection to his prosecution.

Even if some potential jurors were biased against Anyanwu because they were Memphis residents, a venue transfer still wasn't required. That's because the jury pool pulled from four counties in Tennessee consisting of over one million residents. With such a large and diverse jury pool, there would certainly be many jurors—either from Memphis or other towns—who weren't biased against Anyanwu. *See Skilling v. United States*, 561 U.S. 358, 382 (2010) (considering the "size and characteristics of the community in which the crime occurred" to determine whether the

defendant could select an unbiased jury). That means Anyanwu could still select 12 impartial jurors.

In short, Anyanwu hasn't established that the prejudice against him in the district was "so great" that he couldn't receive "a fair and impartial trial there." Fed. R. Crim. P. 21(a). So the district court didn't abuse its discretion in denying his motion for a change of venue.

B.

Anyanwu also challenges the jury-selection process, arguing that the district court didn't meaningfully question jurors about their potential biases. We review a district court's questioning of prospective jurors for abuse of discretion. *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993).

While the Constitution guarantees an impartial jury in criminal cases, it doesn't prescribe specific procedures for jury selection. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). As a result, district courts retain significant discretion in deciding which questions to ask potential jurors. *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991). After all, district courts directly interact with potential jurors and thus are better suited to determine which questions will be useful for uncovering bias. *Bedford v. Collins*, 567 F.3d 225, 232 (6th Cir. 2009). So the only question on appeal is whether the district court made it "impossible" for the defendant "to identify an unqualified juror," thus rendering the trial "fundamentally unfair." *Id.* (quoting *Mu'Min*, 500 U.S. at 426). Anyanwu hasn't met that high bar.

The district court thoroughly questioned potential jurors to ensure they would decide the case based on the evidence and the law rather than their personal views. Although Anyanwu criticizes the district court for asking only "generic" questions, it did far more than that. Appellant's Br. at 31. For instance, the district court asked all potential jurors if they or their

family members had ever been the victim of an online fraud or dating scam. The district court also asked if the jurors had any "strong feelings about Internet or online scams." R. 139, Pg. ID 1481, 1503, 1532, 1547, 1564, 1572. If prospective jurors answered yes, the district court asked additional questions to confirm that the jurors could set aside their personal experiences and render a verdict based on the facts of this case. In one instance, a prospective juror expressed "some pretty strong opinions about cyber crimes and cyber-related activity" and explained that he wasn't "sure that [he] would be able to keep [his] biases in check." *Id.* at 1503, 1506. So the district court asked rigorous follow-up questions. In doing so, the district court sought to "send a message" to the other jurors that they couldn't let their personal views interfere with their decision in this case. *Id.* at 1517. And ultimately, the district court struck that juror for cause. In total, the district court asked jurors 63 times whether they could be fair and impartial.

Despite this comprehensive questioning, Anyanwu faults the district court for not asking all 40 specific questions he requested. But once a district court has confirmed that jurors will follow the court's instructions and impartially apply the law, the court isn't required to ask further questions about specific evidentiary issues or arguments. *United States v. Underwood*, 129 F.4th 912, 939 (6th Cir. 2025). That's because the Constitution doesn't entitle defendants to "map[] every alley and side street of each juror's mind." *Bedford*, 567 F.3d at 233. In other words, the district court didn't need to probe the jurors' thoughts—as Anyanwu requested—on "online dating," "the portrayal of Nigerians in the media," or whether the City of Memphis has enough money to pay for public education, the police, and public transportation. R. 51, Pg. ID 157–58, 160. It needed to confirm they could be impartial—and that's what it did.

Finally, Anyanwu criticizes the district court for not asking more "open-ended questions." Reply Br. at 3. But the Constitution doesn't dictate the form of questions that a district court must

ask during jury selection.  *See Morgan*, 504 U.S. at 729.  Rather, the district court simply needed to provide Anyanwu with enough information to ferret out unqualified jurors.  *See Bedford*, 567 F.3d at 232.  Because the district court's thorough questioning accomplished that goal, it didn't abuse its discretion here.

*     *     *

We affirm.