RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0101p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-3386

MALEK M. AL-MALIKI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:13-cr-00121—Sara E. Lioi, District Judge.

Argued: March 5, 2015

Decided and Filed: May 27, 2015

Before: GIBBONS, SUTTON, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Travis Alan Rossman, ROSSMAN LAW, PLLC, Barbourville, Kentucky, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Travis Alan Rossman, ROSSMAN LAW, PLLC, Barbourville, Kentucky, for Appellant. Daniel R. Ranke, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

McKEAGUE, J., delivered the opinion of the court in which SUTTON, J., joined, and GIBBONS, J., joined except for Part II.B.1. GIBBONS, J. (pg. 15), delivered a separate opinion concurring in part and in the judgment.

---

**OPINION**

---

McKEAGUE, Circuit Judge.   A jury of his peers found Malek al-Maliki guilty of a heinous crime: sexually abusing his own two children, ages twelve and three.   Al-Maliki challenges several aspects of his conviction and sentence.   His constitutional challenge to his conviction is a close call, but it ultimately fails under plain-error review.   The rest of his challenges fail as well.   We affirm.

I

Iraq native Malek al-Maliki had his first child, John Doe #1, with Hinda al-Rhannai in 1998.   Two years later, the couple had a civil marriage and al-Maliki (but not his wife) became a United States citizen.   Their physical union did not last long.   Although they remained legally married, the couple has been separated since 2000 or 2002.   Despite the separation, they had one more child, John Doe #2, in 2007.   Since around 2000, al-Maliki has lived alone on the west side of Cleveland, Ohio, and al-Rhannai has lived in Morocco and then Syria with the two sons.

Al-Maliki visited his family on a few occasions over the years.   The United States claims that during one trip from August to November 2010, he sexually abused his two children (then ages twelve and three), violating 18 U.S.C. §§ 2423(c) and (e).   A grand jury indicted him under that statute, which at the time punished any United States citizen "[1] who travels in foreign commerce, and [2] engages in any illicit sexual conduct," which includes noncommercial sexual acts with a minor, or any attempts to do the same.

Al-Maliki denied all of the charges, and a trial began.   The jury heard from Mark Goldrup, a vice consul at the U.S. Embassy in Damascus, Syria.   He testified that he put al-Rhannai and her children in a safe shelter after al-Rhannai came to the embassy seeking assistance for injuries consistent with domestic abuse.   The jury also heard from Department of Homeland Security Special Agent Gabriel Hagan.   She testified that she observed the sons' open affection toward their mother, but that al-Maliki insisted his wife abused the sons.   She also

testified about a live interview she saw of John Doe #1, where the boy cried and hid his face while struggling to recount the sexual abuse (the "sin," he called it) that he suffered.

Most critically, the jury heard John Doe #1 himself. He told of the horrible things that his father did to him on several occasions, including during al-Maliki's August-to-November 2010 trip to Syria. Early in the trip, John Doe #1 woke abruptly to his mother screaming at al-Maliki for touching the boy's upper thigh while he slept. Al-Maliki "[did not] care," exclaiming, "He is my son. . . . I will touch him. I will do whatever I want." R. 97 at 70. Several days later, al-Maliki lifted his son onto his lap and tried to take off his boxers. John Doe #1 resisted and his mother intervened. Al-Maliki then beat his wife. The abuse only got worse. Later, al-Maliki pinned John Doe #1's arms to his sides with one hand, covered his mouth with the other, and anally raped him. On another occasion, John Doe #1 observed his father masturbating into food items, which were then given to the boy to eat or drink. Al-Maliki also attempted to trick John Doe #2—his three-year-old son—into performing oral sex on him.

With these proofs, the government rested. Al-Maliki moved for a Rule 29 directed verdict (arguing that the government had not established all of the elements of the offense). But the district court denied the motion.

The defense called one witness: al-Maliki. He testified about his "very bad" relationship with his "very disrespect[ful]" and "stubborn" wife. R. 97 at 191. She neglected their children, he said. As for his oldest son, al-Maliki said that he loved him despite the boy's "hate in his heart." *Id.* at 192. Al-Maliki denied ever committing the sexual abuse. He thought his son was "coached by his mom," who "tried to build . . . some hate" between al-Maliki and the boy. *Id.* at 195.

The jury didn't buy al-Maliki's story. It found him guilty beyond a reasonable doubt of engaging and/or attempting to engage in illicit sexual conduct in a foreign place with both John Doe #1 (Count 1) and John Doe #2 (Count 2).

The district court prepared to sentence al-Maliki. It ordered a psychological evaluation, which deemed al-Maliki "manipulative and dishonest" and assessed his "risk for future sexual acting out" as "moderate to high." R. 57 at 10. Over al-Maliki's objection, the district court

applied a four-level increase for use of force to engage in his sexual crimes, U.S.S.G. § 2A3.1(b)(1).  Considering the nature of the offense, the negative psychological evaluation, and al-Maliki's age and limited criminal record, the court sentenced him at the bottom of the guidelines' range: 292 months in prison on each count, to be served concurrently.

Al-Maliki appealed, raising issues relating to the constitutionality of the statute, the admissibility of some of Goldrup's testimony, the prosecutor's statements in closing, the sufficiency of the evidence, and the reasonableness of the sentence.  We reject them all.

II

Al-Maliki argues for the first time on appeal that § 2423(c) is unconstitutional because it exceeds Congress's authority under the Foreign Commerce Clause.  It follows, he argues, that federal courts lack "jurisdiction" over the case.  Before addressing the statute's constitutionality, we must clarify what kind of *jurisdiction* is at issue where, as here, a litigant challenges Congress's authority to pass a criminal law.

A

Al-Maliki argues that an unconstitutional criminal statute deprives federal courts of subject-matter jurisdiction over the criminal case.  But he confuses the "many, too many, meanings" of the term "jurisdiction."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998).

Under 18 U.S.C. § 3231, federal courts "plainly ha[ve] authority over" all offenses against the laws of the United States, *United States v. Lucido*, 612 F.3d 871, 874 (6th Cir. 2010), including § 2423(c).  In al-Maliki's parlance, § 3231 gives federal courts *subject-matter jurisdiction* over criminal cases.  *United States v. Cotton*, 535 U.S. 625, 630–31 (2002).  Other so-called jurisdictional matters involved in the case—like the statute's "jurisdictional nexus" to commerce or Congress's "jurisdiction" to pass the law—demonstrate courts' and litigants' "profligate use of the term [jurisdiction]."  *Union Pac. R. Co. v. Locomotive Engineers*, 558 U.S. 67, 81 (2009).  They deal not with *our* power to hear a case but with *Congress's* authority to regulate certain conduct.  When Congress lacks constitutional authority to pass a law, it acts *ultra vires*.  And when litigants properly challenge laws passed beyond Congress's power, courts

have a duty to void those laws as repugnant with the People's Law: the Constitution. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

The distinction between these two types of "jurisdiction"—a court's subject-matter jurisdiction and Congress's authority (jurisdiction, if you must) to pass a law—makes an enormous practical difference. Challenges to subject-matter jurisdiction cannot be waived or forfeited. *Cotton*, 535 U.S. at 630. But challenges to Congress's authority to pass a law can be forfeited by litigants, *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001), and indeed, can be outright waived (as when a defendant pleads guilty). *United States v. Corp*, 668 F.3d 379, 384–85 (6th Cir. 2012) (collecting cases).

Now back to al-Maliki's challenge. He argues that Congress exceeded its Foreign Commerce Clause authority when passing § 2423(c). That goes not to our power but to Congress's, so it is not a challenge to subject-matter jurisdiction. Al-Maliki can and did forfeit the challenge by failing to raise it below, but he did not waive it because he did not intentionally relinquish it. *See United States v. Olano*, 507 U.S. 725, 732–33 (1993). We accordingly review this constitutional challenge for plain error under Rule 52(b).

Under plain-error review, al-Maliki must show "(1) error (2) that was obvious or clear, (3) that affected [his] substantial rights[,] and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Assuming al-Maliki can show an *obvious error* (a too-generous assumption, we shall see), we "should correct [it]" because it would affect a substantial right (liberty) and would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings" (enforcing an "obvious[ly]" unconstitutional statute). *Olano*, 507 U.S. at 736. So the key questions are whether there was any error (is the statute unconstitutional?), and if so, whether that error was plain (is the statute "obvious[ly] or clear[ly]" unconstitutional?).

B

The Constitution authorizes Congress "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. Does that include the power to punish a citizen's noncommercial

conduct while the citizen resides in a foreign nation? We doubt it, but because of plain-error review, we need not finally decide today. Any error was not plain, so we must affirm.

1

We lean toward finding "error" in enforcing § 2423(c) against al-Maliki for his noncommercial conduct while residing in Syria, but we need not—and do not—decide the issue today.

Under the original meaning of the Constitution, the Foreign Commerce Clause did not give Congress the power to punish the conduct at issue here. "Commerce" originally meant trade or "[i]ntercour[s]e," 1 S. Johnson, A Dictionary of the English Language 361 (4th ed. 1773)—i.e., "selling, buying, and bartering, [and] transporting for these purposes." *United States v. Lopez*, 514 U.S. 549, 585–86 (1995) (Thomas, J., dissenting); see Randy Barnett, *The Original Meaning of the Commerce Clause*, 68 U. Chi. L. Rev. 101, 112–125 (2001). So the Foreign Commerce Clause as originally understood gave Congress the power to regulate trade or intercourse with foreign countries. Simple enough. And it simply does not include the power to criminalize a citizen's noncommercial activity in a foreign country, for that is not "Commerce" as originally understood. Nor, for that matter, is it commerce "*with*" a foreign Nation, which is also required by the textualist reading.

But, alas in the interstate context, we have long since moved away from the original meaning of "regulate Commerce," so we turn to the case law's modern definition of the term. The Constitution as now interpreted gives Congress the power to regulate (1) "the use of the channels of" commerce; (2) "the instrumentalities of . . . or persons or things in" commerce; and (3) economic activities that "substantially affect" commerce. *Lopez*, 514 U.S. at 558–59.

Part of § 2423 tracks the first two *Lopez* categories. Subpart (b), for example, criminalizes traveling in the channels of commerce for the purpose of engaging in illicit sexual conduct with a minor. *Cf. Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 256 (1964). And subpart (a) criminalizes moving a minor in or through commerce for an illicit sexual purpose. *Cf. United States v. Turner*, 77 F.3d 887, 889 (6th Cir. 1996). But the United States neither charged nor proved that al-Maliki used the channels of commerce for an illegal

purpose or was "in [foreign] commerce" when he committed his crime. *Lopez*, 514 U.S. at 559. It charged only under subpart (c).

And subpart (c) is different. The government need only prove that a citizen *at one point* "travel[ed] in foreign commerce"—with no unlawful intent whatsoever—and then committed the regulated, noncommercial act. Indeed, since 2013, the government can just prove that the citizen "resides, either temporarily or permanently, in a foreign country" before committing the act. That's not regulating the channels of, or people in, commerce; it's regulating purely intracountry conduct—*after* the lawful traveling in commerce has ended. It thus seems to us doubtful that *Lopez* categories 1 and 2 suffice to uphold § 2423(c) against al-Maliki.

But what of category 3: a substantial effect on foreign commerce? It doesn't do the trick either: Congress "may not regulate noneconomic activity, such as sex crimes, based on the effect it might have on . . . commerce." *United States v. Kebodeaux*, 133 S. Ct. 2496, 2512 (2013) (Thomas, J., dissenting); *see United States v. Morrison*, 529 U.S. 598, 617–18 (2000). Congress's failure to even try to show the aggregate effect of noncommercial sexual activity on foreign commerce highlights its lack of power here. *See* H.R. Rep. No. 108–66 (2003). Indeed, Congress included neither a jurisdictional statement nor a constitutional authority statement in passing this subpart. *Id.*; *see* Jessica E. Notebaert, *The Search for A Constitutional Justification for the Noncommercial Prong of 18 U.S.C. § 2423(c)*, 103 J. Crim. L. & Criminology 949, 955 (2013). Lopez category 3 fares no better than the first two categories.

Congress, it therefore appears, lacked the power under the Foreign Commerce Clause to pass § 2423(c) as applied to noncommercial conduct. It makes sense, then, that the government conceded at oral argument that it couldn't criminalize the same conduct occurring wholly intrastate. There isn't—and can't be—a generalized federal crime for traveling in interstate commerce with no illicit purpose and then, after a few months, committing illicit sexual conduct with a minor. It likewise makes sense that the government couldn't articulate a limiting principle to prevent Congress from criminalizing *jaywalking* by a United States tourist in Canada. These are crimes in the States, *e.g.*, Ohio Rev. Code Ann. § 2907.04 (illicit sexual conduct with a minor in Ohio), or crimes in foreign countries, *e.g.*, Highway Traffic Act, R.S.O. 1990, c. H.8,

§ 144(22) (Can.) (jaywalking in Ontario), because those governments have a general police power.  But the federal government does not.  *Morrison*, 529 U.S. at 618–19.

So the government argues, as it must, that Congress has greater commerce power over conduct occurring in foreign countries than conduct occurring in the States.  It has some support for that argument.  The Supreme Court, for example, has said (albeit in a dormant commerce clause case), "[T]he Founders intended the scope of the foreign commerce power to be . . . greater" than the interstate commerce power.  *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979).  And the Court reads the Indian Commerce Clause broader than the Interstate Commerce Clause.  *E.g.*, *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989); *see Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561 (1832).  Some lower courts do the same for the Foreign Commerce Clause.  *E.g.*, *United States v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006).  *But see United States v. Bredimus*, 352 F.3d 200, 204–05 (5th Cir. 2003).

We are skeptical.  One reason offered for this broader interpretation is the lack of federalism concerns when Congress regulates activities occurring in foreign countries rather than in the States.  Appellee Br. 23.  But an unbounded reading of the Foreign Commerce Clause allows the federal government to intrude on the sovereignty of other nations—just as a broad reading of the Interstate Commerce Clause allows it to intrude on the sovereignty of the States.  More importantly, an overbroad interpretation of the Foreign Commerce Clause allows the government to intrude on the liberty of individual citizens.  And that seems as least as wrong as a reading of the Commerce Clause that allows the government to intrude on the States.  *See* U.S. Const. amend. X (reserving power to the States "or to the people.").

In any event, Congress's power over regulating foreign commerce is "exclusive," yes, but only when Congress acts "within its compass."  *Henderson v. Mayor of City of New York*, 92 U.S. 259, 272–73 (1875).  That means the States can't regulate foreign commerce in place of the federal government.  *See id.* at 274.  But Congress must still regulate commerce, and it does not have exclusive or plenary power unless it does so.  The power to regulate commerce with foreign countries may be exclusive, which is all *Japan Line* establishes.  But that says nothing about what commerce means.  Giving the word "the same meaning throughout" the Clause so it "remain[s] a unit," *Gibbons v. Ogden*, 22 U.S. 1, 194 (1824); *see* Saikrishna Prakash, *Our Three*

*Commerce Clauses and the Presumption of Intrasentence Uniformity*, 55 Ark. L. Rev. 1149, 1173 (2003), we doubt that Congress has regulated *commerce* here, much less commerce *with* a foreign country.

But we need not finally decide today. As explained in more detail below, because we conclude only that the statute is not *obviously* unconstitutional, al-Maliki's challenge flunks plain-error review.

2

An error is "plain" when, at a minimum, it "is clear under current law." *Olano*, 507 U.S. at 734. A "circuit split precludes a finding of plain error," *United States v. Williams*, 53 F.3d 769, 772 (6th Cir. 1995), for the split is good evidence that the issue is "subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009). A lack of binding case law that answers the question presented will also preclude our finding of plain error. *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013).

Section 2423(c)'s possible defects are not plain under current law. No circuit court has declared § 2423(c) unconstitutional. Two have upheld it against constitutional challenges, one even as applied to noncommercial conduct. *United States v. Pendleton*, 658 F.3d 299, 311 (3d Cir. 2011) (noncommercial conduct); *Clark*, 435 F.3d at 1116. Only one has called it into doubt (and even then resolved the issue on statutory-interpretation grounds). *United States v. Weingarten*, 632 F.3d 60, 71 (2d Cir. 2011). The circuits thus have, *at most*, split on the general issue, which precludes a finding of plain error. *Williams*, 53 F.3d at 772. No binding law exists in our circuit either—if anything, we hinted that the statute is *constitutional* (albeit in dictum in a footnote). *Phillips v. United States*, 734 F.3d 573, 576 n.2 (6th Cir. 2013). And no intervening change in law has made this error plain on appellate review. *See Henderson v. United States*, 133 S. Ct. 1121, 1130 (2013). Plain error did not occur.

We take care to keep the "plain" in "plain error" so as to maintain "the careful balance [Rule 52(b)] strikes between judicial efficiency and the redress of injustice." *Puckett*, 556 U.S. at 135. And so we reject al-Maliki's forfeited challenge under plain-error review.

III

Al-Maliki next challenges the admissibility of Goldrup's testimony on two grounds: that his testimony included an improper hearsay statement, and that it included prejudicial statements about domestic violence.  Nothing improper occurred.

*Hearsay*.  Goldrup's challenged testimony included this out-of-court statement: "[Al-Rhannai] stated that she had been abused by [al-]Maliki."  R. 97 at 15.  But that statement was not offered to prove the truth of the matter asserted (that al-Maliki had in fact abused his wife); it was offered "for the limited purpose of explaining why [Goldrup's] government[al] investigation" began.  *United States v. Martin*, 897 F.2d 1368, 1371 (6th Cir. 1990) (collecting cases).  Two conclusions follow: It is not hearsay, Fed. R. Evid. 801(c), and the government did not violate the Confrontation Clause, *Crawford v. Washington*, 541 U.S. 36, 59–60 n.9 (2004).

*Middle Eastern stereotype*.  Goldrup's testimony also included this statement: "You wouldn't expect a law enforcement response" for spousal abuse in Syria because "it's culturally understood [there] that a man has a right to beat his wife."  R. 97 at 53.  That statement, taken in context, was both relevant and not unduly prejudicial.  It was relevant because it rebutted *al-Maliki's* attack on Goldrup's credibility for not reporting the spousal abuse to Syrian authorities.  *United States v. Chance*, 306 F.3d 356, 385 (6th Cir. 2002); *see United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994).  And it was not unduly prejudicial because the government did not use it in any way to prove the defendant's guilt.  *United States v. Placensia*, 352 F.3d 1157, 1164 (8th Cir. 2003); *see Barnes v. City of Cincinnati*, 401 F.3d 729, 742 (6th Cir. 2005).  This case is thus not like those where the government first *elicits* and then *relies on* stereotypes to prove the offense, *see* Appellant Br. 42–44; Reply Br. 17–18.  The district court did not abuse its discretion in admitting this evidence.

IV

Al-Maliki persists.  He next challenges the district court's failure to *sua sponte* strike some of the prosecutor's statements in closing, ranging from purported violations of the Golden Rule to improper comments about al-Maliki's credibility and race.  Our plain-error review (because al-Maliki didn't object below) is doubly deferential, for we give a prosecutor "wide

latitude" during closing argument. *United States v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008). Despite this latitude, however, the prosecutor may not make comments that "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974); *see United States v. Wells*, 623 F.3d 332, 337–38 (6th Cir. 2010) (on plain-error review, the improper statements must also be "flagrant"). Nothing of the sort happened here.

To start, the prosecutor did not violate the Golden Rule. Such a violation occurs when the prosecutor "urges jurors to identify individually with the victims with comments like 'it could have been you' the defendant [harmed] or 'it could have been your children.'" *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) (internal brackets omitted). Al-Maliki claims violations occurred when the prosecutor asked the jury (1) whether they would expect a child to rehearse his testimony and (2) whether they would have reported the abuse if they were in Syria. The first doesn't implicate the Golden Rule at all; it merely asks the jury to draw reasonable inferences from John Doe #1's testimony. And the second included a reference to the actual testimony ("knowing what you heard from Mr. Goldrup," R. 89 at 61), which prevented the impermissible statement (if it was one) from being flagrant. Neither violated the Golden Rule.

Nor did the prosecutor flagrantly "comment on the credibility of a witness or [] express a personal belief that a particular witness is lying." *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005); *see United States v. Young*, 470 U.S. 1, 11–12 (1985). *At most*, the prosecutor said that he thought al-Maliki was being "inconsistent" because of the discrepancies in his testimony, R. 89 at 38—which our precedent allows, *see Wogenstahl v. Mitchell*, 668 F.3d 307, 331 (6th Cir. 2012). But he did not even reach the outer limits of our precedent because he also stressed that "your recollection of any testimony"—not his—"is the one that controls." R. 89 at 38.

Nor, finally, did the prosecutor flagrantly ask the jury "to infer guilt based on a stereotype." Appellant Br. 55. The prosecutor may not use stereotypes like the one mentioned above—*viz.*, that Middle Eastern culture is more accepting of spousal abuse—as evidence probative of the defendant's guilt. But the prosecutor did not do so here. The remarks were isolated and the jury had ample evidence of guilt, with no need to resort to stereotypes. *See*

*Henry*, 545 F.3d at 376, 382.  And the trial was one for child abuse, not spousal abuse, so the stereotype is off base in any event.  If there was any error, it certainly was not plain.

V

Al-Maliki's weakest argument comes next: sufficiency of the evidence.  We review this challenge under the "manifest miscarriage of justice" standard because al-Maliki forfeited it by failing to renew his Rule 29 motion.  *United States v. Kuehne*, 547 F.3d 667, 697 (6th Cir. 2008); *see* Appellant Br. 57 (conceding that this standard applies).  A manifest miscarriage of justice occurs only when "the record is *devoid* of evidence pointing to guilt."  *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (emphasis added).

This record contains ample evidence of guilt.  Al-Maliki disputes only whether he engaged in illicit sexual conduct, arguing that John Doe #1 was coached to testify against his father.  But we leave these credibility determinations to the jury.  *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010).  And a rational juror could have believed John Doe #1's first-hand account of the despicable sexual abuse.  Sufficient evidence existed.

VI

Al-Maliki's sentencing challenges fare no better.

*Procedural Reasonableness.*  Al-Maliki objected below and here to the district court's application of Sentencing Guideline § 2A3.1(b)(1).  But the district court did not err.  That guideline instructs courts to increase the sentence by four levels "[i]f the offense involved conduct described in 18 U.S.C. § 2241(a) or (b)."  U.S.S.G. § 2A3.1(b)(1).  Section 2241 includes the conduct of "*using force* against [] [an]other person."  18 U.S.C. § 2241(a)(1) (emphasis added).  The enhancement thus applies because, as the district court succinctly stated, al-Maliki "did, in fact, use force against the victim."  R. 98 at 16.

Al-Maliki distorts this plain reading by injecting a geographic component into the word "conduct."  Because the offenses described in §§ 2241(a) and (b) must occur in specific locations (*e.g.*, "the special maritime and territorial jurisdiction of the United States"), al-Maliki argues that the enhancement should carry with it the same geographic component.  But the "*conduct*

described in 18 U.S.C. § 2241" is narrower than the *offense* described in § 2241. Punching someone in the arm is the same conduct whether the punch occurs in Syria, Cleveland, or Timbuktu. Application Note 2(A) to the guideline confirms this plain reading by listing the conduct—including but not limited to using force—that qualifies for the enhancement. The district court correctly interpreted this guideline and applied a procedurally reasonable sentence.

*Substantive Reasonableness.* We apply a "presumption of reasonableness" to sentences that, like this one, are within the guidelines. *Rita v. United States*, 551 U.S. 338, 347 (2007); *see Vonner*, 516 F.3d at 389. And we review only for abuse of discretion.

Al-Maliki has far from rebutted the presumption. He makes one argument: The district court imposed a substantively unreasonable sentence because it did not credit the positive conclusions in the psychology report. Appellant Br. 64–65. But the report contains only *one* conclusion, and it *is* negative: "[B]ased on the overall results of this evaluation," the report reads, "[al-]Maliki's risk for future sexual acting out is considered to be *moderate to high*." R. 57 at 10 (emphasis added). To reach that conclusion, the report considered a four-factor test (which estimated him as "low risk") in addition to his personality disorder and antisocial traits, history of instability, lack of insight and poor judgment, and unwillingness to accept responsibility for his action. The district court did not need to explain its decision to accept the report's overall conclusion—backed up by its personal observation—in any more detail than it did: Because of the report's overall conclusion, "[al-]Maliki is at significant risk to victimize others." R. 98 at 35–36. The bottom-of-the-guidelines sentence is substantively reasonable.

VII

Our circuit's case law says that the cumulative effect of harmless errors can be so prejudicial that it violates the Due Process Clause. *United States v. Adams*, 722 F.3d 788, 832 (6th Cir. 2013). Al-Maliki says that is the case here. Yet the only possible "error" is the constitutionality of 18 U.S.C. §§ 2423(c) and (e)—and even that is a close call. No due process violation has occurred.

## VIII

For these reasons, we affirm.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

JULIA SMITH GIBBONS, Circuit Judge, concurring in part and concurring in the judgment. I join the majority's opinion except for Part II.B.1, which suggests that § 2423(c) might be unconstitutional. We need not reach that difficult question. Plain error review applies to Maliki's constitutional challenge, and any error here cannot have been plain, given that some circuits have upheld § 2423(c) against constitutional challenges and no circuit has declared it unconstitutional.