NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0245n.06

No. 19-1387

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
May 01, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| DEONDRAY CHRISTOPHER ABRAMS, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: DAUGHTREY, GIBBONS, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. Brandon Demko, a Marine Corps veteran struggling with post-traumatic stress disorder, thought he was buying heroin from Deondray Abrams. But Abrams sold him fentanyl, a much stronger drug. Demko took a dose likely forty times more potent than he was anticipating. He died. A jury convicted Abrams of distributing a controlled substance that resulted in death, and the district court imposed a mandatory life sentence. 21 U.S.C. § 841(a)(1), (b)(1)(C). Abrams argues that the district court erred both by admitting evidence of drug sales that he made after Demko's death and by failing to instruct the jury that it must find the drugs he sold Demko proximately caused his death. We need not consider the merits of either argument. Over-whelming evidence proved Abrams's guilt, so any evidentiary error was harmless. Abrams also

did not object to the causation instructions, and he cannot meet the plain-error standard that applies as a result. We affirm.

I

A

While serving in the Marine Corps, Brandon Demko saw combat in Iraq and Afghanistan. When he left the service in 2009, he suffered from post-traumatic stress disorder. He began seeking mental-health treatment after about six months of civilian life. That treatment included inpatient and outpatient programs, support groups, and a prescription medication called Klonopin. Beginning in 2011, Demko spent ten months at a Veterans Affairs treatment center in New York. Regrettably, one of his roommates at that center introduced him to heroin as a way to cope with his anxiety. Demko spent the rest of his life battling both post-traumatic stress disorder and a heroin addiction.

Demko met Robert Larsen, an Army veteran, at a Veterans Affairs hospital in late 2016. Both men were in an outpatient program for substance-use disorders. Like Demko, Larsen became addicted to heroin after leaving the military. Larsen had sustained injuries as an Army infantryman, and doctors originally prescribed opioids for his pain. When he lost access to prescription drugs, he turned to heroin. Demko and Larsen used heroin together about six times in February and March 2017.

The last of those occasions was on March 21, 2017. They were experiencing withdrawal symptoms and decided to buy heroin. Demko called Deondray Abrams from his cell phone to make the purchase. Both Demko and Larsen had bought heroin from Abrams in the past. They drove in Demko's truck to Abrams's residence in Kalamazoo, Michigan. Abrams came to the

truck to exchange the drugs for Demko's money. Demko and Larsen then went to Larsen's apartment in Kalamazoo.

At his apartment, Larsen dissolved the drugs in water and divided the solution equally between two syringes. He administered Demko's injection before administering his own. The last thing Larsen remembers before losing consciousness is Demko saying "[t]hat was too much." When Larsen regained consciousness, he found Demko lying on his kitchen floor. Larsen gave Demko two doses of Narcan, an antidote that can reverse an opioid overdose. It had no effect, so Larsen called 911. Emergency responders also could not revive Demko. The 32-year-old veteran was pronounced dead of an apparent overdose.

A toxicology analysis revealed that Demko's blood contained fentanyl, but not heroin. So while Demko and Larsen thought they were taking heroin, Demko died of a fentanyl overdose.

Five days after Demko's death, his mother reviewed his recent phone calls and saw a number that she suspected was for his drug dealer. She called the number (which turned out to be Abrams's), acted "like [she] was a druggie looking for a fix," and told the person on the other end of the line that "Demko told me to contact you for a fix." After the person impolitely responded that he did not know a Demko, she lost her cool and told him that she was his worst nightmare and was going to kill him. The person hung up. Less than a minute later, Abrams called Larsen asking about Demko.

It took the police a few months to suspect Abrams as the person who sold the drugs to Demko. Larsen initially lied about what happened. He told the 911 dispatcher that he had found Demko on the floor after stepping outside his apartment to talk to a neighbor. And he did not tell police at the scene that they had bought drugs from Abrams. In June 2017, however, the police

connected Demko to Abrams through Demko's phone records. Larsen then identified Abrams as Demko's dealer in a photo line-up.

Later that summer, police set up a series of controlled buys from Abrams. A confidential informant asked for heroin from Abrams, but some of the drugs that Abrams provided (or tried to provide) included fentanyl. The informant bought heroin from Abrams on August 17, and a mixture containing heroin, fentanyl, and cocaine on August 21. On August 22, the informant tried to make another buy, but Abrams asked for a ride before making the exchange. The police decided to arrest Abrams instead. They found him in possession of two substances: one that contained heroin and fentanyl and another that contained cocaine.

B

In May 2018, Abrams was indicted on five drug counts. The first charged him with distributing a substance containing fentanyl, the use of which resulted in Brandon Demko's death. *See* 21 U.S.C. § 841(a)(1), (b)(1)(C). Because Abrams had a "prior conviction for a felony drug offense," this count carried a mandatory life sentence. *Id.* § 841(b)(1)(C). The other counts concerned the controlled buys. Count 2 charged Abrams with distributing a substance containing heroin; Count 3 with distributing a substance containing heroin, fentanyl, and cocaine; Count 4 with possessing with intent to distribute a substance containing heroin and fentanyl; and Count 5 with possessing with intent to distribute a substance containing cocaine. Abrams eventually pleaded guilty to these four counts, but proceeded to trial on the first count charging him with causing Demko's death.

Before trial the United States notified Abrams that it intended to introduce "other acts" evidence of Abrams's drug sales. *See* Fed. R. Evid. 404(b)(2). The evidence included three of Abrams's August 2017 drug offenses, "as charged in Counts 2 through 4 of the Indictment." The

government wanted to introduce these drug sales because it anticipated that Abrams would argue he was a heroin dealer, not a fentanyl dealer, thus creating doubt over whether he sold Demko fentanyl. In some of these later controlled purchases, the drug that Abrams sold (or intended to sell) contained fentanyl even though the informant had asked for heroin. Abrams moved to exclude this evidence. The district court granted Abrams's motion in part and denied it in part. It permitted evidence of the transactions in Counts 3 and 4 because the substances Abrams sold (or intended to sell) during those deals had contained fentanyl. The court did not allow evidence of the transaction in Count 2 because it involved only heroin.

The case proceeded to trial. Abrams's first trial ended in a mistrial with a "hopelessly deadlocked jury." The government retried Abrams a few weeks later. Larsen testified about what had happened on March 21: Demko used his cell phone to call Abrams from the home of Demko's parents in Coldwater, Michigan. Demko then drove with Larsen in his truck to Abrams's residence in Kalamazoo. Abrams came out and exchanged the drugs for money. After picking up the drugs, Demko and Larsen drove to Larsen's apartment. Larsen prepared the drugs and injected Demko and then himself. Larsen believed that the drug he prepared was heroin. But he lost consciousness, which was not "typical" in his experience. When he awoke, he found Demko lying unresponsive on the floor. Unable to revive Demko using Narcan, he called 911. Larsen also admitted that he had lied during the 911 call and when responders interviewed him at his apartment.

Cell-phone records and location data corroborated this story. Demko's phone records showed that the last five calls made from his cell phone were to Abrams's cell phone. The first two were placed in Coldwater, where Larsen and Demko had been staying, at 11:44 a.m. and 12:14 p.m. The third was placed in Portage, Michigan at 1:10 p.m. The last two were placed in Kalamazoo at 1:12 p.m. and 1:18 p.m. In addition, both Demko and Abrams had been monitored that

day: Demko by a Garmin GPS device in his truck, and Abrams by a GPS "tether" imposed as part of his parole. Investigators retraced their movements from data on these devices. Abrams and Demko were in the same location—outside Abrams's residence—from about 1:23 p.m. to 1:29 p.m. Demko's truck then left Abrams's apartment and was parked near Larsen's residence at 1:37 p.m. Larsen called 911 at 3:44 p.m.

The jury also heard about the toxicology analysis performed with Demko's autopsy. Demko had several substances in his blood and urine. In his blood were Naloxone, remnant THC-COOH metabolite, a metabolite of Clonazepam, and fentanyl. The Naloxone was the Narcan that Larsen had administered. The THC-COOH metabolite indicated that Demko had used marijuana. The Clonazepam metabolite indicated that Demko had taken Klonopin, the drug he used for his post-traumatic stress disorder. The fentanyl indicated that Demko had taken that opioid shortly before his death. The analysis detected no heroin in Demko's blood. It did, however, detect morphine in his urine, which suggested that he had used heroin at some point.

Two physicians testified about Demko's cause of death. Dr. Joyce deJong performed the autopsy. The toxicology report led her to conclude that Demko's "death was caused by a mixed drug intoxication with Fentanyl and the Clonazepam[.]" Dr. deJong did not believe that Demko died "based on the Clonazepam alone[,]" but agreed that he "could . . . have succumbed to death based on the Fentanyl alone[.]" She explained that the amount of fentanyl in Demko's blood was almost twice the high end of the therapeutic range. She opined that "but for the Fentanyl, [Demko] would not have died."

An emergency-medicine physician and toxicologist, Dr. Bryan Judge, also testified. He explained that morphine, heroin, and fentanyl are related opioids, with heroin "[a]bout two to five times more potent than morphine," and fentanyl "about 80 to 100 times more potent than

morphine." So a heroin user who mistakenly takes fentanyl would experience a drug "at least 40 times more potent[.]" In Dr. Judge's experience as an emergency-room physician, dealers sometimes "spike heroin with Fentanyl to give users [a] much more substantial high." But because fentanyl "is much more potent," "people can die" when they mistake it for heroin. Turning to Demko's case, Dr. Judge opined that only the fentanyl killed him. He ruled out heroin despite the presence of morphine in Demko's urine. Because morphine did not appear in Demko's blood, Dr. Judge believed that Demko had not used heroin on the day he died. Dr. Judge also did not believe that "mixed drug intoxication" from the Clonazepam had any role in Demko's death. In Judge's opinion, "it was the Fentanyl alone that killed him."

Abrams's defense challenged Larsen's credibility and poked holes in the government's case. Abrams highlighted the inconsistencies between the information Larsen provided at the scene and his later testimony. He suggested that Larsen's initial story was the true story, and raised the possibility that Larsen, not Abrams, had caused Demko's death. Abrams also challenged other aspects of the government's proof. He noted that the first responders had disposed of Demko's and Larsen's syringes, so no one could "examine[] [them] to determine that there was really Fentanyl in them." And officers interviewing Larsen had worn body cameras, but the footage had not been retained. Finally, Abrams noted the differences in the two doctors' opinions about the cause of death.

While the first jury deadlocked, the second jury found Abrams guilty in less than two hours. The district court sentenced Abrams to a mandatory sentence of life imprisonment on Count 1, *see* 21 U.S.C. § 841(b)(1)(C), and concurrent 360-month sentences on the remaining counts.

II

Abrams raises evidentiary and instructional challenges to his conviction.

A. *"Other Acts" Evidence*. Abrams first argues that the district court erred by admitting evidence of his August 2017 drug transactions with the confidential informant. The informant testified that Abrams sold him a controlled substance on August 21 and that Abrams possessed a controlled substance with intent to sell it on August 22. The government also played recordings of these transactions and read into evidence portions of Abrams's plea hearing. Abrams admitted that he gave the informant a controlled substance on August 21 and that he knew it contained heroin, fentanyl, and cocaine. And he admitted that he possessed with intent to distribute a substance containing heroin and fentanyl on August 22. The court gave a limiting instruction that the jury could "consider [this] evidence only as it relates to the government's claim on the defendant's intent, motive, opportunity, plan, knowledge and identity." But Abrams argues that the government lacked any valid purpose for this evidence under Federal Rule of Evidence 404(b) and that, in any event, the evidence was unduly prejudicial.

Much ink has been spilled over our standard of review for this type of Rule 404(b) ruling. *See United States v. Perez-Martinez*, 746 F. App'x 468, 474–75 (6th Cir. 2018); *United States v. Mandoka*, 869 F.3d 448, 456–57 (6th Cir. 2017). Whatever the correct standard on the merits, we may reverse only if any evidentiary error affected Abrams's "substantial rights." Fed. R. Crim. P. 52(a). That is, "[w]hen the government presents other convincing or overwhelming evidence, we may deem the admission of 404(b) evidence mere harmless error." *United States v. Layne*, 192 F.3d 556, 573 (6th Cir. 1999); *see United States v. LaVictor*, 848 F.3d 428, 448 (6th Cir. 2017). "In determining whether an error is harmless, we must take account of what the error meant to the

jury, not singled out and standing alone, but in relation to all else that happened." *United States v. Murphy*, 241 F.3d 447, 453 (6th Cir. 2001) (citation omitted and alteration adopted).

We need not decide whether the admission of Abrams's drug sales to the confidential informant violated Rule 404(b) because, when this other-acts evidence is considered in relation to the entire body of proof, it is clear that any error did not "materially affect[] the verdict." *LaVictor*, 848 F.3d at 448 (quoting *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013)). The government presented an overwhelming case. Abrams concedes that the government did not need to prove that he knowingly sold fentanyl (rather than heroin) to Demko; it needed to prove only that Abrams knowingly sold "*a* controlled substance in schedule I or II" to Demko and that the substance caused Demko's death. 21 U.S.C. § 841(b)(1)(C) (emphasis added); *see generally Burrage v. United States*, 571 U.S. 204, 208–09 (2014). On that front, while Abrams attacked the inconsistencies between what Larsen said immediately after Demko's death and what he said at trial, uncontroverted GPS and cell-phone data backed up Larsen's trial account. Demko's last five phone calls were to Abrams. And GPS data confirmed that Abrams and Demko met briefly about two hours before the 911 call. Cell-phone records also confirmed the call that Demko's mother made to Abrams, and the call that Abrams immediately made to Larsen thereafter. In addition, the evidence showed that the drugs that Abrams sold to Demko caused his death. Both Dr. deJong and Dr. Judge testified that, but for the fentanyl, Demko would not have died. Abrams can rely only on rank speculation to argue that Demko obtained the drugs from someone else or that something else caused Demko's death.

Not only that, the jury already heard evidence "covering this very specific subject" of Abrams's drug dealing. *LaVictor*, 848 F.3d at 448. Larsen testified that he had purchased drugs from Abrams both before and after the transaction that led to Demko's March 17 death. And

Abrams does not challenge this additional other-acts evidence. So Abrams's August 2017 drug activity did not tell the jurors anything they did not already know.

In response, Abrams argues generically that evidence of prior bad acts carries unusual weight with juries. Perhaps so. *Cf. United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010). But we have held that the introduction of this evidence still can be harmless where "the weight of the improperly admitted evidence was slight in the context of the trial as a whole." *United States v. Chalmers*, 554 F. App'x 440, 453 (6th Cir. 2014). That is the case here—whether or not the district court properly admitted the evidence of the August 2017 transactions.

B. *Proximate-Cause Instruction*. Abrams next challenges the district court's failure to give a proximate-cause instruction. The government needed to prove that Abrams sold Demko a controlled substance and that Demko's death "result[ed] from the use of such substance." 21 U.S.C. § 841(b)(1)(C). When explaining this element, the court instructed the jury only on but-for cause: To prove "that the distribution resulted in" Demko's death, "the government need only prove that the distribution was a 'but for' cause of death. That is, but for the distribution of Fentanyl, [Demko] would not have died on March 21, 2017." When asked if the parties had any problems with these instructions, Abrams's counsel said he believed the instructions were "more than adequate." Now, however, Abrams contends that the court should have required the jury to find that Demko's death was a foreseeable result, not just a but-for result, of Abrams's drug trafficking. Because Abrams did not make this proximate-cause argument to the district court, we review it for plain error. *United States v. Ramamoorthy*, 949 F.3d 955, 960 (6th Cir. 2020).

We cannot declare an error to be "plain" "unless the error is clear under current law." *United States v. Olano*, 507 U.S. 725, 734 (1993). "In our circuit, 'a lack of binding caselaw that answers the question presented will preclude our finding of plain error.'" *United States v. Hill*,

769 F. App'x 352, 355 (6th Cir. 2019) (quoting *United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015)) (alterations adopted). A circuit split in the other circuits also "precludes a finding of plain error[.]" *Al-Maliki*, 787 F.3d at 794 (citation omitted).

Abrams cannot satisfy this standard because our court has not yet answered this proximate-cause question and because the weight of authority cuts against him. The Supreme Court has held that § 841(b)(1)(C)'s "death results" enhancement requires the "but for" finding the jury made in this case. *See Burrage*, 571 U.S. at 218–19. The evidence in *Burrage* did not satisfy that "minimum requirement for a finding of causation," so the Court did not decide whether the statute requires a proximate-cause finding. *Id.* at 210–11 (citation and emphasis omitted). Both before and after *Burrage*, however, several circuit courts have held that § 841(b) does not contain the proximate-cause requirement that Abrams seeks. *See United States v. Thompson*, 945 F.3d 340, 346 (5th Cir. 2019) (collecting cases). If a circuit split dooms an argument subject to plain-error review, *Al-Maliki*, 787 F.3d at 794, a slate of decisions uniformly rejecting the argument must doom it as well. Abrams's argument thus fails because "any potential error was not 'plain.'" *United States v. Vonner*, 516 F.3d 382, 387 (6th Cir. 2008) (en banc).

In response, Abrams asks us to find a proximate-cause element in § 841(b)(1)(C) based on our precedent interpreting a different statute. *See United States v. Martinez*, 588 F.3d 301, 318–19 (6th Cir. 2009) (interpreting 18 U.S.C. § 1347(a)). *Martinez* did not "answer[] the question presented" by this case. *Al-Maliki*, 787 F.3d at 794 (citation omitted). It thus cannot be the basis for a conclusion that an alleged error was "plain."

We affirm.